# SUPREME COURT OF THE UNITED STATES

GEORGE PORTER, JR. *v.* BILL McCOLLUM,
ATTORNEY GENERAL OF FLORIDA, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 08–10537.   Decided November 30, 2009

PER CURIAM.

Petitioner George Porter is a veteran who was both wounded and decorated for his active participation in two major engagements during the Korean War; his combat service unfortunately left him a traumatized, changed man.   His commanding officer's moving description of those two battles was only a fraction of the mitigating evidence that his counsel failed to discover or present during the penalty phase of his trial in 1988.

In this federal postconviction proceeding, the District Court held that Porter's lawyer's failure to adduce that evidence violated his Sixth Amendment right to counsel and granted his application for a writ of habeas corpus. The Court of Appeals for the Eleventh Circuit reversed, on the ground that the Florida Supreme Court's determination that Porter was not prejudiced by any deficient performance by his counsel was a reasonable application of *Strickland* v. *Washington*, 466 U. S. 668 (1984).  Like the District Court, we are persuaded that it was objectively unreasonable to conclude there was no reasonable probability the sentence would have been different if the sentencing judge and jury had heard the significant mitigation evidence that Porter's counsel neither uncovered nor presented.  We therefore grant the petition for certiorari in part and reverse the judgment of the Court of Appeals.[1]

---

[1] We deny the petition insofar as it challenges his conviction.

Per Curiam

## I

Porter was convicted of two counts of first-degree murder for the shooting of his former girlfriend, Evelyn Williams, and her boyfriend Walter Burrows. He was sentenced to death on the first count but not the second.

In July 1986, as his relationship with Williams was ending, Porter threatened to kill her and then left town. When he returned to Florida three months later, he attempted to see Williams but her mother told him that Williams did not want to see him. He drove past Williams' house each of the two days prior to the shooting, and the night before the murder he visited Williams, who called the police. Porter then went to two cocktail lounges and spent the night with a friend, who testified Porter was quite drunk by 11 p.m. Early the next morning, Porter shot Williams in her house. Burrows struggled with Porter and forced him outside where Porter shot him.

Porter represented himself, with standby counsel, for most of the pretrial proceedings and during the beginning of his trial. Near the completion of the State's case in chief, Porter pleaded guilty. He thereafter changed his mind about representing himself, and his standby counsel was appointed as his counsel for the penalty phase. During the penalty phase, the State attempted to prove four aggravating factors: Porter had been "previously convicted" of another violent felony (*i.e.*, in Williams' case, killing Burrows, and in his case, killing Williams);[2] the murder was committed during a burglary; the murder was committed in a cold, calculated, and premeditated man-

––––––––––

[2] It is an aggravating factor under Florida law that "[t]he defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person." Fla. Stat. §921.141(5)(b) (1987). In Porter's case, the State established that factor by reference to Porter's contemporaneous convictions stemming from the same episode: two counts of murder and one count of aggravated assault. Tr. 5 (Mar. 4, 1988).

ner; and the murder was especially heinous, atrocious, or cruel. The defense put on only one witness, Porter's ex-wife, and read an excerpt from a deposition. The sum total of the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son. Although his lawyer told the jury that Porter "has other handicaps that weren't apparent during the trial" and Porter was not "mentally healthy," he did not put on any evidence related to Porter's mental health. 3 Tr. 477–478 (Jan. 22, 1988).

The jury recommended the death sentence for both murders. The trial court found that the State had proved all four aggravating circumstances for the murder of Williams but that only the first two were established with respect to Burrows' murder. The trial court found no mitigating circumstances and imposed a death sentence for Williams' murder only. On direct appeal, the Florida Supreme Court affirmed the sentence over the dissent of two justices, but struck the heinous, atrocious, or cruel aggravating factor. *Porter* v. *State*, 564 So. 2d 1060 (1990) *(per curiam)*. The court found the State had not carried its burden on that factor because the "record is consistent with the hypothesis that Porter's was a crime of passion, not a crime that was meant to be deliberately and extraordinarily painful." *Id.*, at 1063 (emphasis deleted). The two dissenting justices would have reversed the penalty because the evidence of drunkenness, "combined with evidence of Porter's emotionally charged, desperate, frustrated desire to meet with his former lover, is sufficient to render the death penalty disproportional punishment in this instance." *Id.*, at 1065–1066 (Barkett, J., concurring in part and dissenting in part).

In 1995, Porter filed a petition for postconviction relief in state court, claiming his penalty-phase counsel failed to investigate and present mitigating evidence. The court

conducted a 2-day evidentiary hearing, during which Porter presented extensive mitigating evidence, all of which was apparently unknown to his penalty-phase counsel. Unlike the evidence presented during Porter's penalty hearing, which left the jury knowing hardly anything about him other than the facts of his crimes, the new evidence described his abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity.

The depositions of his brother and sister described the abuse Porter suffered as a child. Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child. Porter's father was violent every weekend, and by his siblings' account, Porter was his father's favorite target, particularly when Porter tried to protect his mother. On one occasion, Porter's father shot at him for coming home late, but missed and just beat Porter instead. According to his brother, Porter attended classes for slow learners and left school when he was 12 or 13.

To escape his horrible family life, Porter enlisted in the Army at age 17 and fought in the Korean War. His company commander, Lieutenant Colonel Sherman Pratt, testified at Porter's postconviction hearing. Porter was with the 2d Division, which had advanced above the 38th parallel to Kunu-ri when it was attacked by Chinese forces. Porter suffered a gunshot wound to the leg during the advance but was with the unit for the battle at Kunu-ri. While the Eighth Army was withdrawing, the 2d Division was ordered to hold off the Chinese advance, enabling the bulk of the Eighth Army to live to fight another day. As Colonel Pratt described it, the unit "went into position there in bitter cold night, terribly worn out, terribly weary, almost like zombies because we had been in constant—for five days we had been in constant contact with

the enemy fighting our way to the rear, little or no sleep, little or no food, literally as I say zombies.” 1 Tr. 138 (Jan. 4, 1996). The next morning, the unit engaged in a “fierce hand-to-hand fight with the Chinese” and later that day received permission to withdraw, making Porter’s regiment the last unit of the Eighth Army to withdraw. *Id.*, at 139–140.

Less than three months later, Porter fought in a second battle, at Chip’yong-ni. His regiment was cut off from the rest of the Eighth Army and defended itself for two days and two nights under constant fire. After the enemy broke through the perimeter and overtook defensive positions on high ground, Porter’s company was charged with retaking those positions. In the charge up the hill, the soldiers “were under direct open fire of the enemy forces on top of the hill. They immediately came under mortar, artillery, machine gun, and every other kind of fire you can imagine and they were just dropping like flies as they went along.” *Id.*, at 150. Porter’s company lost all three of its platoon sergeants, and almost all of the officers were wounded. Porter was again wounded and his company sustained the heaviest losses of any troops in the battle, with more than 50% casualties. Colonel Pratt testified that these battles were “very trying, horrifying experiences,” particularly for Porter’s company at Chip’yong-ni. *Id.*, at 152. Porter’s unit was awarded the Presidential Unit Citation for the engagement at Chip’yong-ni, and Porter individually received two Purple Hearts and the Combat Infantryman Badge, along with other decorations.

Colonel Pratt testified that Porter went absent without leave (AWOL) for two periods while in Korea. He explained that this was not uncommon, as soldiers sometimes became disoriented and separated from the unit, and that the commander had decided not to impose any punishment for the absences. In Colonel Pratt’s experience, an “awful lot of [veterans] come back nervous

wrecks. Our [veterans'] hospitals today are filled with people mentally trying to survive the perils and hardships [of] . . . the Korean War," particularly those who fought in the battles he described. *Id.*, at 153.

When Porter returned to the United States, he went AWOL for an extended period of time.[3] He was sentenced to six months' imprisonment for that infraction, but he received an honorable discharge. After his discharge, he suffered dreadful nightmares and would attempt to climb his bedroom walls with knives at night.[4] Porter's family eventually removed all of the knives from the house. According to Porter's brother, Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all.

In addition to this testimony regarding his life history, Porter presented an expert in neuropsychology, Dr. Dee, who had examined Porter and administered a number of psychological assessments. Dr. Dee concluded that Porter suffered from brain damage that could manifest in impulsive, violent behavior. At the time of the crime, Dr. Dee testified, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance, two statutory mitigating circumstances, Fla. Stat. §921.141(6). Dr. Dee also testified that Porter had substantial difficulties with

---

[3] Porter explained to one of the doctors who examined him for competency to stand trial that he went AWOL in order to spend time with his son. Record 904.

[4] Porter's expert testified that these symptoms would "easily" warrant a diagnosis of posttraumatic stress disorder (PTSD). 2 Tr. 233 (Jan. 5, 1996). PTSD is not uncommon among veterans returning from combat. See Hearing on Fiscal Year 2010 Budget for Veterans' Programs before the Senate Committee on Veterans' Affairs, 111th Cong., 1st Sess., 63 (2009) (uncorrected copy) (testimony of Eric K. Shinseki, Secretary of Veterans Affairs (VA), reporting that approximately 23 percent of the Iraq and Afghanistan war veterans seeking treatment at a VA medical facility had been preliminarily diagnosed with PTSD).

reading, writing, and memory, and that these cognitive defects were present when he was evaluated for competency to stand trial. 2 Tr. 227–228 (Jan. 5, 1996); see also Record 904–906. Although the State's experts reached different conclusions regarding the statutory mitigators,[5] each expert testified that he could not diagnose Porter or rule out a brain abnormality. 2 Tr. 345, 382 (Jan. 5, 1996); 3 *id.*, at 405.

The trial judge who conducted the state postconviction hearing, without determining counsel's deficiency, held that Porter had not been prejudiced by the failure to introduce any of that evidence. Record 1203, 1206. He found that Porter had failed to establish any statutory mitigating circumstances, *id.*, at 1207, and that the nonstatutory mitigating evidence would not have made a difference in the outcome of the case, *id.*, at 1210. He discounted the evidence of Porter's alcohol abuse because it was inconsistent and discounted the evidence of Porter's abusive childhood because he was 54 years old at the time of the trial. He also concluded that Porter's periods of being AWOL would have reduced the impact of Porter's military service to "inconsequential proportions." *Id.*, at 1212. Finally, he held that even considering all three categories of evidence together, the "trial judge and jury still would have imposed death." *Id.*, at 1214.

The Florida Supreme Court affirmed. It first accepted the trial court's finding that Porter could not have established any statutory mitigating circumstances, based on the trial court's acceptance of the State's experts' conclusions in that regard. *Porter* v. *State*, 788 So. 2d 917, 923 (2001) *(per curiam)*. It then held the trial court was cor-

––––––––––

[5] The State presented two experts, Dr. Riebsame and Dr. Kirkland. Neither of the State's experts had examined Porter, but each testified that based upon their review of the record, Porter met neither statutory mitigating circumstance.

rect to find "the additional nonstatutory mitigation to be lacking in weight because of the specific facts presented." *Id.*, at 925. Like the postconviction court, the Florida Supreme Court reserved judgment regarding counsel's deficiency. *Ibid.*[6] Two justices dissented, reasoning that counsel's failure to investigate and present mitigating evidence was "especially harmful" because of the divided vote affirming the sentence on direct appeal—"even without the substantial mitigation that we now know existed"—and because of the reversal of the heinous, atrocious, and cruel aggravating factor. *Id.*, at 937 (Anstead, J., concurring in part and dissenting in part).

Porter thereafter filed his federal habeas petition. The District Court held Porter's penalty-phase counsel had been ineffective. It first determined that counsel's performance had been deficient because "penalty-phase counsel did little, if any investigation . . . and failed to effectively advocate on behalf of his client before the jury." *Porter* v. *Crosby*, No. 6:03–cv–1465–Orl–31KRS, 2007 WL 1747316, \*23 (MD Fla., June 18, 2007). It then determined that counsel's deficient performance was prejudicial, finding that the state court's decision was contrary to clearly established law in part because the state court failed to consider the entirety of the evidence when re-

———————

[6] The postconviction court stated defense counsel "was not ineffective for failing to pursue mental health evaluations and . . . [Porter] has thus failed to show sufficient evidence that any statutory mitigators could have been presented." Record 1210. It is not at all clear whether this stray comment addressed counsel's deficiency. If it did, then it was at most dicta, because the court expressly "decline[d] to make a determination regarding whether or not Defense Counsel was in fact deficient here." *Id.*, at 1206. The Florida Supreme Court simply paraphrased the postconviction court when it stated "trial counsel's decision not to pursue mental evaluations did not exceed the bounds for competent counsel." *Porter* v. *State*, 788 So. 2d 917, 923–924 (2001) *(per curiam)*. But that court also expressly declined to answer the question of deficiency. *Id.*, at 925.

weighing the evidence in mitigation, including the trial evidence suggesting that "this was a crime of passion, that [Porter] was drinking heavily just hours before the murders, or that [Porter] had a good relationship with his son." *Id.*, at *30.

The Eleventh Circuit reversed. It held the District Court had failed to appropriately defer to the state court's factual findings with respect to Porter's alcohol abuse and his mental health. 552 F. 3d 1260, 1274, 1275 (2008) *(per curiam)*. The Court of Appeals then separately considered each category of mitigating evidence and held it was not unreasonable for the state court to discount each category as it did. *Id.*, at 1274. Porter petitioned for a writ of certiorari. We grant the petition and reverse with respect to the Court of Appeals' disposition of Porter's ineffective-assistance claim.

## II

To prevail under *Strickland*, Porter must show that his counsel's deficient performance prejudiced him. To establish deficiency, Porter must show his "counsel's representation fell below an objective standard of reasonableness." 466 U. S., at 688. To establish prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694. Finally, Porter is entitled to relief only if the state court's rejection of his claim of ineffective assistance of counsel was "contrary to, or involved an unreasonable application of" *Strickland*, or it rested "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U. S. C. §2254(d).

Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*. *Rompilla* v. *Beard*, 545 U. S. 374, 390 (2005). It is unquestioned that under the prevail-

ing professional norms at the time of Porter's trial, counsel had an "obligation to conduct a thorough investigation of the defendant's background." *Williams* v. *Taylor*, 529 U. S. 362, 396 (2000). The investigation conducted by Porter's counsel clearly did not satisfy those norms.

Although Porter had initially elected to represent himself, his standby counsel became his counsel for the penalty phase a little over a month prior to the sentencing proceeding before the jury. It was the first time this lawyer had represented a defendant during a penalty-phase proceeding. At the postconviction hearing, he testified that he had only one short meeting with Porter regarding the penalty phase. He did not obtain any of Porter's school, medical, or military service records or interview any members of Porter's family. In *Wiggins* v. *Smith*, 539 U. S. 510, 524, 525 (2003), we held counsel "fell short of . . . professional standards" for not expanding their investigation beyond the presentence investigation report and one set of records they obtained, particularly "in light of what counsel actually discovered" in the records. Here, counsel did not even take the first step of interviewing witnesses or requesting records. Cf. *Bobby* v. *Van Hook*, *ante*, at 6–8 (holding performance not deficient when counsel gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources); *Strickland*, 466 U. S., at 699 ("[Counsel's] decision not to seek more character or psychological evidence than was already in hand was . . . reasonable"). Beyond that, like the counsel in *Wiggins*, he ignored pertinent avenues for investigation of which he should have been aware. The court-ordered competency evaluations, for example, collectively reported Porter's very few years of regular school, his military service and wounds sustained in combat, and his father's "over-disciplin[e]." Record 902–906. As an explanation, counsel described Porter as fatalistic and uncooperative. But he acknowledged that

although Porter instructed him not to speak with Porter's ex-wife or son, Porter did not give him any other instructions limiting the witnesses he could interview.

Counsel thus failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service. The decision not to investigate did not reflect reasonable professional judgment. *Wiggins*, *supra*, at 534. Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation. See *Rompilla*, *supra*, at 381–382.

## III

Because we find Porter's counsel deficient, we must determine whether the Florida Supreme Court unreasonably applied *Strickland* in holding Porter was not prejudiced by that deficiency. Under *Strickland*, a defendant is prejudiced by his counsel's deficient performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U. S., at 694. In Florida, the sentencing judge makes the determination as to the existence and weight of aggravating and mitigating circumstances and the punishment, Fla. Stat. §921.141(3), but he must give the jury verdict of life or death "great weight," *Tedder* v. *State*, 322 So. 2d 908, 910 (Fla. 1975) *(per curiam)*. Porter must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence. To assess that probability, we consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and "reweig[h] it against the evidence in aggravation." *Williams*, *supra*, at 397–398.

This is not a case in which the new evidence "would barely have altered the sentencing profile presented to the

sentencing judge." *Strickland*, *supra*, at 700. The judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability. They learned about Porter's turbulent relationship with Williams, his crimes, and almost nothing else. Had Porter's counsel been effective, the judge and jury would have learned of the "kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Wiggins*, *supra*, at 535. They would have heard about (1) Porter's heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling. See *Penry* v. *Lynaugh*, 492 U. S. 302, 219 (1989) ("'[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable'"). Instead, they heard absolutely none of that evidence, evidence which "might well have influenced the jury's appraisal of [Porter's] moral culpability." *Williams*, 529 U. S., at 398.

On the other side of the ledger, the weight of evidence in aggravation is not as substantial as the sentencing judge thought. As noted, the sentencing judge accepted the jury's recommendation of a death sentence for the murder of Williams but rejected the jury's death-sentence recommendation for the murder of Burrows. The sentencing judge believed that there were four aggravating circumstances related to the Williams murder but only two for the Burrows murder. Accordingly, the judge must have reasoned that the two aggravating circumstances that were present in both cases were insufficient to warrant a death sentence but that the two additional aggravating

circumstances present with respect to the Williams murder were sufficient to tip the balance in favor of a death sentence. But the Florida Supreme Court rejected one of these additional aggravating circumstances, *i.e.*, that Williams' murder was especially heinous, atrocious, or cruel, finding the murder "consistent with . . . a crime of passion" even though premeditated to a heightened degree. 564 So. 2d, at 1063–1064. Had the judge and jury been able to place Porter's life history "on the mitigating side of the scale," and appropriately reduced the ballast on the aggravating side of the scale, there is clearly a reasonable probability that the advisory jury—and the sentencing judge—"would have struck a different balance," *Wiggins*, 539 U. S., at 537, and it is unreasonable to conclude otherwise.

The Florida Supreme Court's decision that Porter was not prejudiced by his counsel's failure to conduct a thorough—or even cursory—investigation is unreasonable. The Florida Supreme Court either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing. Under Florida law, mental health evidence that does not rise to the level of establishing a statutory mitigating circumstance may nonetheless be considered by the sentencing judge and jury as mitigating. See, *e.g.*, *Hoskins* v. *State*, 965 So. 2d 1, 17–18 (Fla. 2007) *(per curiam)*. Indeed, the Constitution requires that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor." *Eddings* v. *Oklahoma*, 455 U. S. 104, 112 (1982). Yet neither the postconviction trial court nor the Florida Supreme Court gave any consideration for the purpose of nonstatutory mitigation to Dr. Dee's testimony regarding the existence of a brain abnormality and cognitive defects.[7] While the State's

———————

[7]The Florida Supreme Court acknowledged that Porter had presented evidence of "statutory and nonstatutory mental mitigation," 788

experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge.

Furthermore, the Florida Supreme Court, following the state postconviction court, unreasonably discounted the evidence of Porter's childhood abuse and military service. It is unreasonable to discount to irrelevance the evidence of Porter's abusive childhood, especially when that kind of history may have particular salience for a jury evaluating Porter's behavior in his relationship with Williams. It is also unreasonable to conclude that Porter's military service would be reduced to "inconsequential proportions," 788 So. 2d, at 925, simply because the jury would also have learned that Porter went AWOL on more than one occasion. Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did.[8] Moreover, the relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter.[9]

––––––––––

So. 2d, at 921, but it did not consider Porter's mental health evidence in its discussion of nonstatutory mitigating evidence, *id.*, at 924.

[8] See Abbott, The Civil War and the Crime Wave of 1865–70, 1 Soc. Serv. Rev. 212, 232–234 (1927) (discussing the movement to pardon or parole prisoners who were veterans of the Civil War); Rosenbaum, The Relationship Between War and Crime in the United States, 30 J. Crim. L. & C. 722, 733–734 (1940) (describing a 1922 study by the Wisconsin Board of Control that discussed the number of veterans imprisoned in the State and considered "the greater leniency that may be shown to exservice men in court").

[9] Cf. Cal. Penal Code Ann. §1170.9(a) (West Supp. 2009) (providing a special hearing for a person convicted of a crime "who alleges that he or she committed the offense as a result of post-traumatic stress disorder,

The evidence that he was AWOL is consistent with this theory of mitigation and does not impeach or diminish the evidence of his service. To conclude otherwise reflects a failure to engage with what Porter actually went through in Korea.

As the two dissenting justices in the Florida Supreme Court reasoned, "there exists too much mitigating evidence that was not presented to now be ignored." *Id.*, at 937 (Anstead, J., concurring in part and dissenting in part). Although the burden is on petitioner to show he was prejudiced by his counsel's deficiency, the Florida Supreme Court's conclusion that Porter failed to meet this burden was an unreasonable application of our clearly established law. We do not require a defendant to show "that counsel's deficient conduct more likely than not altered the outcome" of his penalty proceeding, but rather that he establish "a probability sufficient to undermine confidence in [that] outcome." *Strickland*, 466 U. S., at 693–694. This Porter has done.

The petition for certiorari is granted in part, and the motion for leave to proceed *in forma pauperis* is granted. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

substance abuse, or psychological problems stemming from service in a combat theater in the United States military"); Minn. Stat. §609.115, Subd. 10 (2008) (providing for a special process at sentencing if the defendant is a veteran and has been diagnosed as having a mental illness by a qualified psychiatrist).