# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3046

_____

Richard Strong

*Petitioner - Appellant*

v.

Donald Roper

*Respondent - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 16, 2013
Filed: December 12, 2013

_____

Before RILEY, Chief Judge, WOLLMAN and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Richard Strong was convicted of two counts of capital murder and sentenced to death. The Missouri Supreme Court affirmed the convictions and sentence on direct appeal and later affirmed the denial of Strong's motion for postconviction

relief. The district court[1] denied Strong's petition for a writ of habeas corpus under 28 U.S.C. § 2254. We granted a certificate of appealability on four of Strong's claims, and we now affirm the denial of the writ.

## I. Background

On October 23, 2000, police officers were dispatched to the home of Eva Washington following a disconnected 911 call. The officers knocked on both the front and back doors, but no one responded. Strong eventually came to the back door, where the officers asked about his wife and children. Strong responded that Washington and the children were asleep. He then stepped outside and closed the door behind him. When asked again about Washington and the children, Strong replied that Washington was at work and the children were inside the apartment. The officers asked to check on the children, but Strong informed them that he had locked himself out. Strong then knocked on the door, calling for someone to open it. The officers noticed that Strong was sweating profusely, had dark stains on the knees of his jeans, and had blood on his hands. When no one answered, the officers kicked in the door. Strong ran away. After he was apprehended, Strong told the officers, "[Y]ou should have shot me, they're both dead, I killed them."

Inside the apartment, the officers found the bodies of Washington and her two-year-old daughter, Zandrea Thomas. The bodies were located on the floor in the back bedroom, where the police also discovered Washington and Strong's three-month-old child, who was unharmed, and a butcher knife. An autopsy revealed that Washington had been stabbed twenty-one times and had endured five slash wounds. Zandrea had been stabbed nine times and had endured twelve slash wounds.

---

[1]The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

A jury found Strong guilty of two counts of first-degree murder and recommended that Strong be sentenced to death on both counts. The trial court imposed a sentence of death. As set forth above, the Missouri Supreme Court affirmed Strong's convictions and sentence, State v. Strong, 142 S.W.3d 702 (Mo. 2004) (en banc), and later affirmed the denial of Strong's motion for postconviction relief, Strong v. State, 263 S.W.3d 636 (Mo. 2008) (en banc). Following the district court's denial of Strong's petition for a writ, we granted a certificate of appealability on the following issues: (1) whether the denial of Strong's challenges to the prosecutor's peremptory strikes of two African-American venirepersons violated Strong's right to equal protection; (2) whether the admission of Washington's out-of-court statements to a police officer that Strong had assaulted her violated Strong's right of confrontation; (3) whether trial counsel rendered ineffective assistance by failing to investigate, discover, and present to the jury certain mitigating evidence; and (4) whether the prosecutor's use of a PowerPoint presentation during penalty phase closing arguments deprived Strong of his right to a fundamentally fair trial.

## II. Discussion

To succeed on a claim for habeas relief under 28 U.S.C. § 2254, an applicant must show that the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d). A state court decision is contrary to the Supreme Court's clearly established precedent

-3-

"if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "In other words, it is not enough for us to conclude that, in our independent judgment, we would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." Rousan v. Roper, 436 F.3d 951, 956 (8th Cir. 2006). A state court's findings are entitled to a presumption of correctness, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## A. Peremptory Strikes

During jury selection, the prosecutor used peremptory strikes to remove from the jury pool Sylvia Stevenson and Luke Bobo, both of whom are African American. Strong, who also is African American, challenged the peremptory strikes under Batson v. Kentucky, 476 U.S. 79 (1986). After hearing the prosecutor's race-neutral reasons for the strikes, the trial court overruled Strong's objections. On direct appeal, the Missouri Supreme Court applied Batson and determined that the trial court did not err in denying Strong's challenge to the state's peremptory strikes of Bobo and Stevenson. The federal district court denied habeas relief on this ground, concluding that the state courts had reasonably determined that the prosecutor's reasons were not pretext for discrimination.

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]" Batson, 476 U.S. at 89. Batson established

a three-step inquiry to determine whether a prosecutor exercised peremptory strikes in violation of the Equal Protection Clause:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003) (citations omitted). "Within this framework, the defendant may rely on 'all of the circumstances that bear upon the issue of racial animosity' to show purposeful discrimination." Cole v. Roper, 623 F.3d 1183, 1188 (8th Cir. 2010) (quoting Snyder v. Louisiana, 552 U.S. 472, 478 (2008)). "Striking a black panelist for reasons that apply 'just as well to an otherwise-similar nonblack who is permitted to serve' is evidence tending to prove purposeful discrimination." Edwards v. Roper, 688 F.3d 449, 454 (8th Cir. 2012) (quoting Miller-El v. Dretke, 545 U.S. 231, 241 (2005)).

"Whether a peremptory strike was motivated by race is ultimately a question of fact." Taylor v. Roper, 577 F.3d 848, 854 (8th Cir. 2009) (citing Dretke, 545 U.S. at 240). Strong argues that the Missouri Supreme Court's decision involved an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d)(2). Strong's petition can be granted only if "it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge." Rice v. Collins, 546 U.S. 333, 338 (2006).

### 1. Venireperson Stevenson

We first consider Strong's claim regarding the peremptory strike of Stevenson. Stevenson indicated on the juror questionnaire that she had no minor children. When

the prosecutor asked during *voir dire* whether anyone had a relative who had been convicted of a crime, Stevenson responded that her brother had been convicted of stealing and was imprisoned. She stated that her brother's circumstances would not prevent her from being fair and impartial. Stevenson later told the court that a member of her church worked for the state as a manager for the division of family services and that her niece counseled inmates. When asked whether she would be able to consider equally the punishment of death and life imprisonment, Stevenson replied in the affirmative:

> I think it's circumstantial, too. You can't make a decision without hearing the facts, so my opinion, if the facts say so, then I wouldn't have a problem with it. But if the facts don't say it, I cannot go that route.

Over Strong's objection, the prosecutor struck Stevenson from the jury pool. The prosecutor offered the following reasons for his decision: that Stevenson appeared particularly unhappy about sequestration; that she did not have young children or contact with young children; that her demeanor suggested that she was uninterested; that she had a brother in prison; that "she was particularly weak on the death sentence"; and that she mentioned church and religion. The court found those reasons to be race neutral.

Defense counsel responded that Stevenson was similarly situated to Kimberly Keachie, a Caucasian woman who did not have children, whose friend had been convicted of manslaughter, and who was not struck. Counsel went on to list other individuals who remained in the jury pool, despite having no minor children. Defense counsel disagreed that Stevenson was weak on the death penalty, saying, "[M]y recollection and notes indicate that she was quite willing and responsive to the question of the death penalty[.]" The prosecutor then countered that "although [Keachie] doesn't have young children, she is very young, she is a teacher and works

with children." He further argued that the only characteristic Stevenson shared with the other jurors defense counsel listed was a lack of young children.

The trial court agreed that Stevenson had demonstrated "physical disdain" when she learned that the jury might be sequestered, noting that Stevenson's reaction was "much stronger than any other individual on the jury panel." The trial court also determined that whether a juror had young children was an "extremely important factor" because the trial involved the alleged murder of a two-year-old child. The court thus credited the prosecutor's reasons for distinguishing Stevenson from the other jurors who did not have children. On direct appeal, the Missouri Supreme Court concluded that "the totality of the circumstances establishes that the trial court did not clearly err by allowing the prosecutor's peremptory challenge of venireperson Stevenson." Strong, 142 S.W.3d at 714.

Strong has not shown that it was unreasonable to credit the prosecutor's race-neutral reasons for striking Stevenson. The trial court found at least two of the prosecutor's reasons persuasive: Stevenson's reaction to sequestration and her lack of minor children. Strong does not dispute that a prosecutor could reasonably strike a juror based on her negative reaction to sequestration. He argues instead that Stevenson did not have any such reaction. He contends that "no record was made of Ms. Stevenson's body language or facial expressions at the time sequestration was discussed[,]" that Stevenson did not say that sequestration would impose an undue hardship, and that Stevenson's reaction did not cause the prosecutor to ask Stevenson how she felt about being sequestered. Appellant's Br. 22-23. But the trial court witnessed Stevenson's reaction and found that she had exhibited physical disdain. See Snyder, 552 U.S. at 477 ("[D]eterminations of credibility and demeanor lie peculiarly within a trial judge's province[.]" (internal quotation marks and citation omitted)). Strong has not shown that the trial court's finding was unreasonable. With respect to the second reason, Strong does not dispute that the prosecutor could reasonably strike a juror who did not have young children. He contends that the

-7-

prosecutor's decision to strike Stevenson, while allowing Keachie to serve, however, is evidence of discrimination. Based on the *voir dire* record, it was not unreasonable for the trial court to find that the distinctions drawn between Stevenson and Keachie were legitimate. Keachie was a teacher who worked with young children. Strong argues that "no one knows whether [Stevenson] had occasion to be around children," Appellant's Br. 25, but the record's silence as to whether Stevenson spent time with children does not render unreasonable the trial court's determination that the prosecutor's strike was not motivated by race.

## 2. Venireperson Bobo

We next consider Strong's claim regarding the peremptory strike of Bobo, who listed his occupation as assistant dean/director of Covenant Seminary. During *voir dire*, Bobo told the court that he had a second cousin who had been convicted of murder and was incarcerated. Bobo said that his cousin's conviction would not prevent him from being fair and impartial because he was "so far removed" from it. When asked whether he was "so far removed from [his cousin's conviction] that [he did not] know whether or not the sentence [his cousin] received was considered fair or not[,]" Bobo initially responded, "Well, of course his mother believes that he was set up." Bobo later said that he knew so little about the case that he did not know whether the sentence his cousin received was fair. Bobo stated that he would be able to consider the evidence and declare a punishment of death or life without parole. The prosecutor exercised a peremptory strike to remove Bobo from the jury pool. In response to Strong's Batson objection, the prosecutor offered the following reasons for his decision to strike Bobo: that Bobo was the assistant dean of a seminary, that Bobo's cousin was in prison, and that Bobo was not strong on the death penalty.

After the court found those reasons to be race neutral, defense counsel argued that the reasons were pretextual because the prosecutor had not used a peremptory strike on Martin McCabe, a Caucasian juror who had retired from teaching at a

parochial school. In response, the prosecutor distinguished "being a teacher at a school with a religious affiliation [from] being the dean of an institution that trains religious personnel." The prosecutor maintained that he did not want very religious people on the jury. He further argued that, unlike McCabe, Bobo had a cousin who was in jail for murder. The trial court concluded that Bobo and McCabe were not similarly situated because being a teacher at a parochial school is "an extremely different situation than being the director, assistant dean of a seminary that is actually teaching individuals to go into [a religious vocation]" and because McCabe did not have a family member in jail for murder. In denying the Batson challenge, the court also found that the prosecutor himself was credible. On direct appeal, the Missouri Supreme Court found no clear error in the trial court's ruling.

Strong has not shown that it was unreasonable to credit the prosecutor's race-neutral reasons for striking Bobo. Although he argues that the prosecutor's decision to strike Bobo while allowing McCabe to serve constitutes evidence of purposeful discrimination, he has not rebutted the trial court's finding that Bobo and McCabe were not similarly situated. Strong further argues that the prosecutor's reasons for striking Bobo are implausible and unpersuasive. According to Strong, Bobo's statements during *voir dire* indicated that he could impose either the death penalty or life imprisonment and that his cousin's conviction and imprisonment would not affect Bobo's decision. Accordingly, he contends that the record refutes the prosecutor's claims that Bobo was too religious to serve on the jury, that Bobo's judgment might be affected because he had a relative in prison, and that Bobo was not strong on the death penalty. Strong essentially asks us to reweigh the evidence and find in his favor, which is not ours to do. Strong has not shown that the trial court unreasonably determined that the prosecutor's strike was not motivated by race.

### 3. Peremptory Strikes Based on Religion

Strong argues in passing that the dismissal of potential jurors because they are religious violated his rights under the Missouri Constitution and the Constitution of the United States. Strong did not preserve this issue for appellate review in the state courts, the issue was not certified for appeal, and he did not cite any law to support his argument. See Strong, 142 S.W.3d at 713, 714 (holding that Strong did not preserve the issue for appellate review); see also Strong, 263 S.W.3d at 646 (considering Strong's claim "that trial counsel was ineffective for failing to raise religion-based Batson challenges"). We thus will not consider it.

### B. Admission of Washington's Statements to the Police Officer

During the penalty phase of trial, the state presented evidence that Strong had physically abused Washington during their relationship. A police officer testified that he was dispatched to Washington's apartment at 11:30 p.m. on November 10, 1999, following a 911 call. When he arrived, Washington was "crying, shaken, visibly upset, borderline hysterical." She had a knot on her forehead, her left eye was bruised, and she had urinated on herself. When the prosecutor asked whether Washington had said anything as the officer approached, the officer responded that "she claimed [Strong] hit me, he hit me in the eye, and he hit me in the mouth, and he choked me until I passed out." Strong did not object to the admission of Washington's statement.

On direct review, Strong argued that the admission of Washington's statement violated the hearsay rule. The Missouri Supreme Court held that the trial court properly admitted the statement as an excited utterance. Although the United States Supreme Court had issued its opinion in Crawford v. Washington, 541 U.S. 36 (2004), before Strong's direct appeal was decided, the Missouri Supreme Court did not apply Crawford to determine whether Washington's statement should have been

excluded. On habeas review, the federal district court applied <u>Crawford</u> and denied Strong's claim for relief.

In <u>Crawford</u>, the Supreme Court held that the Confrontation Clause bars the introduction of testimonial statements by a witness who did not appear at trial and whom the defendant did not have an opportunity to cross examine. 541 U.S. at 68. The Court declined to provide a "comprehensive definition of 'testimonial[,]'" acknowledging that its refusal to do so "will cause interim uncertainty." <u>Id.</u> at 68, 68 n.10. "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." <u>Id.</u> at 68.

Strong argues that Washington's statements were testimonial and thus should have been excluded. When the state supreme court adjudicated Strong's claim in 2004, however, Supreme Court precedent had not established whether an excited utterance made in the presence of a police officer was testimonial. As set forth above, the Supreme Court had "specifically left ambiguous the definition of 'testimonial[.]'" <u>United States v. Manfre</u>, 368 F.3d 832, 838 n.1 (8th Cir. 2004); <u>see</u> <u>United States v. Brun</u>, 416 F.3d 703, 707-08 (8th Cir. 2005) (applying <u>Crawford</u> and holding that a crime victim's statements to an officer were not testimonial because they were excited utterances and the interaction was "unstructured, and not the product of police interrogation"). Moreover, Washington's statements were made in circumstances different from those in <u>Crawford</u>, in which the statements were made during a police interrogation while the witness was in police custody, had been read her <u>Miranda</u> warnings, and was questioned by a detective. Washington's statements, on the other hand, were made as the officer approached her apartment. There is no indication that the officer had asked Washington any questions. The adjudication of Strong's claim thus did not result in a decision that was contrary to clearly established federal law. The definition of testimonial was not clearly established, and the Missouri Supreme Court was confronted with facts that were materially different from <u>Crawford</u>.

-11-

Strong argues that we should consider Hammon v. Indiana, the companion case to Davis v. Washington, 547 U.S. 813 (2006), in deciding whether the Missouri Supreme Court's decision was contrary to clearly established federal law. Hammon was decided two years after the Missouri Supreme Court denied Strong's direct appeal. We thus decline to consider it because we "measure state-court decisions 'against [the Supreme] Court's precedents as of the time the state court renders its decision.'" Greene v. Fisher, 132 S. Ct. 38, 44 (2011) (emphasis omitted) (quoting Cullen v. Pinholster, 131 S. Ct. 1388, 1399 (2011)).

## C. Defense Counsel's Investigation and Presentation of Mitigating Circumstances

### 1. Factual and Procedural Background

Attorney Bradley Dede represented Strong at trial. Dede was an experienced criminal defense attorney, who had served as lead counsel on five or six capital cases and worked on several others. His firm had taken Strong's case on a $15,000 retainer, which covered legal fees but did not cover costs related to experts. Attorney Patrick Malone assisted Dede on Strong's case and filed his appearance in January 2001. At that time, Malone had been practicing law for about a year, had limited trial experience, and had not worked on a capital case.

In early 2001, the court granted defense counsel's motion for a psychiatric examination under Missouri Revised Statutes § 552.020. John Rabun, M.D., a certified forensic examiner, attempted to evaluate Strong on two separate occasions, but Strong declined to be interviewed. Accordingly, the court ordered that Strong be admitted to the Fulton State Hospital for a period of observation. Thereafter, Dr. Rabun submitted to the court his opinion that Strong "had the capacity to know and appreciate the nature, quality and wrongfulness of his conduct" and that Strong "had the capacity to form the intent as charged." Rabun reported that "following two weeks of inpatient observation, the staff at Fulton State Hospital did not uncover any

-12-

signs or symptoms to suggest that Mr. Strong is mentally ill." Strong "presented no behaviors consistent with a mental disorder. Rather, Mr. Strong interacted appropriately at the hospital."

While he was hospitalized, Strong "did not endorse any symptoms suggestive of a serious medical or neurological disorder, including seizures." His physical and neurological examinations were free of pathology. Strong also did not report any anxiety or depression. Moreover, Strong told a nurse "that he had never had any problems with 'voices at any time.'" Dr. Rabun diagnosed Strong as having varicose veins, but found no psychological or personality disorders. According to Dr. Rabun's report,

> This examiner canvassed the progress notes in Mr. Strong's medical record to look for any possibility of a mental disorder. Mr. Strong was described in the progress notes as "very polite, calm, and focused." His only medical complaint concerned his varicose veins in both lower extremities. He had no problem with his sleep or appetite at Fulton State Hospital. He indicated several times that he had never sought nor received any psychiatric treatment. In addition, he did not endorse a family history of psychiatric illness.

Dede testified that he had discussed Dr. Rabun's report with Strong and Strong's family, but did not retain any other doctor to evaluate Strong.

Dede also testified that he did not hire a mitigation specialist to prepare for the penalty phase of Strong's trial. He and Malone worked together to develop Strong's case for mitigation. Dede decided that he would try to portray Strong as a person who "was able to reason and care and -- and do good things for people" and contrast the "bizarre behavior" of Strong's criminal acts with his otherwise good behavior. Dede testified that Strong did not cooperate in the preparation of his defense and that

"most, if not all, of the information that I got to try to help [his defense] didn't come from him."

Malone testified that he and Dede discussed mitigation throughout Strong's case. According to Malone, Dede explained the law and what types of evidence could be considered mitigating evidence. In the month or so before trial, Malone interviewed potential mitigation witnesses and wrote interview summaries. Malone did not recall asking the witnesses about Strong's childhood. The state had provided defense counsel the records that it had gathered on Strong from jail, work, and school. Dede testified that a report from the staff at Fulton State Hospital indicated that Strong had denied any history of mental, physical, or sexual abuse. Moreover, Dede had developed a good relationship with Strong's mother, whom he had met several times. Neither Strong nor his mother told Dede about any history of abuse in the family.

Fifteen witnesses testified on Strong's behalf during the penalty phase of trial, including several of Strong's family members. Their testimony supported Dede's theory of mitigation: that Strong was a good person who had done good things and whose violent actions were an exception to his mostly good behavior.

In the state postconviction proceedings, Strong alleged that his attorneys were ineffective for "failing to present evidence of Mr. Strong's complete social history and an explanation of how that social history impacted his behavior throughout his life and on the day of the murders." Strong, 263 S.W.3d at 652. Postconviction counsel's investigation revealed that Strong's basic needs often were not met during his childhood. Strong's mother entered into relationships with abusive men, and his father had abandoned the family before Strong was born. Strong's brothers sometimes locked him in a closet. The family lived in squalor in violent neighborhoods. They moved repeatedly. Strong claimed that he was sexually abused by a babysitter when he was five and by a stranger when he was twelve.

-14-

Postconviction counsel discovered that Strong suffered from seizures or spells, had low intellectual functioning, and had a family history of mental illness. Strong argued to the Missouri Supreme Court that "[the] evidence would show that his violent acts were the result of a violent, abusive, and traumatic life." Id. Strong further argued that counsel "should have called experts such as Dr. Wanda Draper and Dr. Marilyn Hutchinson during the penalty phase to explain that the murders were caused by the uncontrollable mental illness Mr. Strong suffered due to his impoverished childhood filled with neglect, violence, and abuse." Id. at 653.

The Missouri Supreme Court rejected Strong's claim of ineffective assistance of counsel. The court determined that Dede had conducted a thorough investigation into mitigation evidence and that he acted reasonably when he decided that "the best strategy was to show Mr. Strong as a good man, able to do good things—not to blame Mr. Strong's actions on a bad childhood." Id. According to the Missouri Supreme Court, "[t]he record demonstrates a thorough investigation by trial counsel into mitigation evidence and, given the information received from his investigation, he proceeded in a reasonable manner." Id. On habeas review, the district court determined that the Missouri Supreme Court had reasonably applied Strickland v. Washington, 466 U.S. 668 (1984), to the facts of Strong's case.

## 2. Discussion

The Counsel Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The Supreme Court long has recognized that the "right to counsel is the right to effective assistance of counsel." Strickland, 466 U.S. at 686 (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." Id. at 687. The defendant must show that

-15-

counsel's performance was deficient and that the defendant was prejudiced by the deficient performance. Id.

To prove that counsel's performance was deficient, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "Judicial scrutiny of counsel's performance is highly deferential, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment." Bucklew v. Luebbers, 436 F.3d 1010, 1016 (8th Cir. 2006). On appeal from the denial of habeas relief, Strong's claim is governed by both Strickland and AEDPA. Accordingly, our review of the Missouri Supreme Court's decision "is twice deferential: we apply a highly deferential review to the state court decision; the state court, in turn, is highly deferential to the judgments of trial counsel." Nooner v. Norris, 402 F.3d 801, 808 (8th Cir. 2005). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 131 S. Ct. 770, 788 (2011).

Strong argues that the state supreme court unreasonably applied Strickland when it held that Dede's penalty phase strategy was based on an adequate investigation. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. We measure counsel's performance "against an objective standard of reasonableness," and "hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made, and by giving a heavy measure of deference to counsel's judgment[.]" Rompilla v. Beard, 545 U.S. 374, 380 (2005) (internal quotation marks and citation omitted). Strong contends that counsel's pursuit of a so-called good guy defense was based on an inadequate investigation into Strong's childhood and mental health.

-16-

### a. Family and Social History Investigation

Strong argues that trial counsel was ineffective for failing to investigate adequately his background and pursue a mitigation strategy that included evidence of his troubled childhood. Strong maintains that Dede delegated the entire investigation to Malone, who was inexperienced and who began the mitigation investigation during the month before trial. He also argues that counsel failed to investigate other sources that might have provided insight into Strong's background, like medical records, mental health records, or employment records.

Strong compares his case to the Supreme Court's decisions in Williams v. Taylor, 529 U.S. 362 (2000), and Wiggins v. Smith, 539 U.S. 510 (2003).[2] In both cases, the Court held that trial counsel's performance was deficient because they did not fulfill their obligation to conduct a thorough mitigation investigation. In Williams, "counsel did not begin to prepare for [the penalty] phase of the proceeding until a week before the trial." 529 U.S. at 395. They failed to discover "extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." Id. Moreover, counsel did not seek prison records that would have shown that Williams helped crack a prison drug ring, nor did they pursue the testimony of a prison official who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." Id. at 396. Counsel failed even to return a call of a certified public accountant who knew Williams through a prison ministry program and who had offered to testify on Williams's behalf. Id.

---

[2]Strong also compares his case to Porter v. McCollum, 558 U.S. 30 (2009) (per curiam). Porter was decided after the Missouri Supreme Court denied Strong's motion for postconviction relief. Accordingly, although we find Porter distinguishable, we limit our analysis "to the law as it was 'clearly established' by [Supreme Court] precedents at the time of the state court's decision." Worthington v. Roper, 631 F.3d 487, 498 n.5 (8th Cir. 2011) (quoting Wiggins, 539 U.S. at 520).

Similarly, in Wiggins, "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. The records counsel had obtained—a presentence investigation report and city service records documenting the defendant's placements in the state foster care system—revealed significant leads that counsel nonetheless failed to pursue. Id. at 525.

The investigation into Strong's background was far more thorough than the constitutionally inadequate investigations in Williams and Wiggins. Both Dede and Malone worked on Strong's case for mitigation. Malone interviewed potential mitigation witnesses in the month before trial, but Dede's investigation began long before then.[3] Although Strong argues that counsel failed to investigate documentary evidence of Strong's background, Dede obtained Strong's school records from Strong's mother and Strong's jail records, work records, and school records from the state. Strong does not argue that those documents revealed leads that counsel did not follow, nor does he argue that the documents discovered during postconviction proceedings revealed significant information about Strong's childhood. Strong argues instead that counsel's investigation must have been deficient because counsel failed to discover that Strong was abused as a child and grew up in an impoverished, dangerous environment. According to Dede, he investigated Strong's background, but the description of Strong's background that came to light after his conviction was completely different than the background Dede had learned of before trial.

Based on the evidence Dede discovered, it is at least arguable that a reasonable attorney could decide to forgo further inquiry into Strong's childhood. Neither Strong nor his mother told Dede that Strong was physically or sexually abused. Dede

---

[3]Strong views the preparation for the penalty phase as separate from the preparation for the guilt phase, but it appears that Dede worked on both phases as he readied himself for trial.

-18-

testified that he inquired about Strong's childhood and any abuse, although he could not remember specific questions that he had asked of Strong or Strong's mother. When postconviction counsel asked Dede a series of questions about whether he knew of certain physical and sexual abuse acts that occurred within Strong's family or whether he knew that Strong's mother had engaged in prostitution to provide for the family, Dede responded, "Quite to the contrary.  There was nothing that I recall that was presented to indicate that the family had any of those sorts of -- actions. . . . I wouldn't say necessarily an intact family, but there were none of those sort of extraordinary events which occurred."  Dede later testified—after being asked about Strong's mother's relationships with abusive men—that "everything that you've told me, to the best of my recollection, paints an entirely different picture of what was told to me."  According to Dede, there was no indication that "there was anything in . . . [Strong's] childhood . . . that would have led to anything."  Dede remembered Strong's mother as a "hardworking, conscientious mother."  He further testified that he had reviewed records wherein Strong had denied any physical or sexual abuse.  In light of the evidence counsel's investigation revealed, Dede reasonably decided to employ a mitigation strategy that contrasted the events of October 23, 2000, with the otherwise generous, helpful, hardworking, and loving person, whom the mitigation witnesses knew and cared for.  The Missouri Supreme Court did not unreasonably apply federal law when it held that counsel had conducted an adequate mitigation investigation.

### b.  Mental Health Investigation

Strong argues that the Missouri Supreme Court unreasonably applied Strickland when it held that Dede's investigation into Strong's mental health was constitutionally adequate. We disagree. When Dede decided against hiring an expert to evaluate Strong, he knew that Strong had denied having any personal or family history of psychiatric illness.  He also knew that Strong had denied having seizures and that Strong's neurological examination was free of pathology.  Dede had studied

-19-

Dr. Rabun's report, which indicated that Strong did not show signs of mental illness or personality disorders. He also discussed the report with Strong and Strong's family. Dede testified that although he had considered retaining an expert to complete a psychiatric evaluation of Strong, he decided against doing so after discussing the matter with his client. Strong argues that Dede's "reliance on a court-appointed mental health expert . . . cannot be deemed a reasonable investigation into potential mental status mitigators." Appellant's Br. 44. While Dr. Rabun's report served as the most thorough evidence of Strong's mental health, Dede investigated other sources of information, including records on Strong from jail, work, and school. Dede's investigation revealed that Strong's mental health was sound, and it is at least arguable that a reasonable attorney could decide to forgo further inquiry into Strong's mental status.

Strong contends that Dede should have completed a more thorough mental health investigation based on a notation in Strong's jail records indicating a family history of schizophrenia. Strong compares his case to Rompilla v. Beard, 545 U.S. 374 (2005). In Rompilla, trial counsel knew that the prosecutor planned to introduce evidence of the defendant's prior conviction at sentencing, but nonetheless failed to analyze the readily available court file on the conviction. Id. at 385-86. The Supreme Court held that counsel's performance was deficient and that the petitioner suffered prejudice. "[I]t is uncontested they would have found a range of mitigation leads that no other source had opened up." Id. at 390. In contrast to the situation in Rompilla, however, reasonable attorneys could disagree on whether the lead that counsel allegedly missed—a psychologist's note stating that Strong had reported that his grandmother and aunt suffered from schizophrenia—required counsel to undertake further investigation, when there was no indication that Strong himself suffered from mental illness.

In light of Dede's adequate investigation into Strong's mental health, Dede's decision not to delve further fell within the range of professionally reasonable

-20-

judgments. The Missouri Supreme Court thus did not unreasonably apply federal law when it held that counsel acted within his discretion when he decided against hiring mental health experts and presenting expert evidence.

### c. American Bar Association's Guidelines

Strong argues that counsel failed to follow the American Bar Association's (ABA) Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, which calls for the defense team to include a mitigation specialist and an individual qualified to screen the defendant for mental or psychological disorders or impairments. The Supreme Court has emphasized, however, that the ABA standards serve only as guides to determining what is reasonable, for "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. As set forth above, the Missouri Supreme Court reasonably concluded that counsel's investigation was constitutionally adequate. We thus cannot say that Dede's decision to structure the defense team as he did fell outside the range of legitimate decisions.

### D. PowerPoint Presentation During Prosecutor's Penalty Phase Closing Arguments

Over defense counsel's objection, the prosecutor displayed a PowerPoint presentation during the state's penalty phase closing argument. The presentation was shown on a five-foot-by-five-foot screen and began with a full screen photograph of the murder weapon, a bloody butcher knife. It went on to show nineteen photos of the victims that were taken during the autopsies and showed the wounds that they had suffered. The autopsy photos did not cover the full screen. Instead, individual photos were layered on top of the photo of the murder weapon, until the screen was

-21-

covered and all of the autopsy photos were displayed. The screen then went blank and the presentation continued with a photo of Washington when she was alive, a photo of Zandrea when she was alive, and Strong's mug shot, together on the same screen. In closing, a full screen photograph depicted the crime scene, showing the bodies of Washington and Zandrea lying together on the floor. The final slide placed Strong's mug shot onto the lower right corner of the photo of the crime scene. Of the photos used in the presentation, only the ones showing the victims when they were alive had not been admitted as evidence.

On direct appeal, Strong challenged the admission of the autopsy photos during the guilt phase, as well as the showing of the PowerPoint presentation during the state's penalty phase closing argument. In holding that the disputed photos were admissible, the Missouri Supreme Court concluded that "each photo was independently relevant and assisted the jurors in some respect to show the scene of the crime, the victims' identities, the nature and extent of the wounds, the condition and location of the bodies, or Strong's mental state at the time of the murders." Strong, 142 S.W.3d at 716. With respect to the PowerPoint presentation, the state argued that it helped prove the statutory aggravating factor that the murders were "outrageously or wantonly vile, horrible or inhuman" in that they involved "torture, or depravity of mind." Mo. Rev. Stat. § 565.032.2(7). The jury was instructed that it could "make a determination of depravity of mind" only if it found that Strong had "committed repeated and excessive acts of physical abuse" upon the victims and that the killings were thus "unreasonably brutal." MAI-CR 3d 313.40. The Missouri Supreme Court held that the trial court had not abused its discretion in allowing the state to show the presentation to the jurors.

Strong argues that he was denied a fair trial because the PowerPoint presentation caused the jury "to decide the appropriate penalty based on emotion, rather than reason and the evidence as presented." Appellant's Br. 58. He argues that, even if the individual photos were admissible, the projection of the photos onto

a screen and in a montage, "superimposing the photos over one another, and placing a mugshot of Strong over the top of the photos, still violated Strong's right to due process." Id. at 56.

The Missouri Supreme Court determined that "Strong fail[ed] to establish that the slide presentation during the penalty phase prompted the jury to act other than on the basis of reason." Strong, 142 S.W.3d at 716. Its holding was neither contrary to, nor an unreasonable application of, clearly established federal law. It answered in the negative the relevant question whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

Even if the PowerPoint presentation should not have been shown to the jury, it did not render the trial fundamentally unfair and the resulting verdict did not constitute a denial of due process. During the guilt phase of trial, the jury had seen the graphic crime scene and autopsy photos. The arrangement of the photos and their projection on a screen during closing argument no doubt reminded the jury of the gruesome nature of the crime. But the presentation arguably served to show that Strong acted with "depravity of mind[,]" Mo. Rev. Stat. § 565.032.2(7), in that he "committed repeated and excessive acts of physical abuse" upon the victims, MAI-CR 3d 313.40. See Rousan, 436 F.3d at 958-59 (holding that the admission of photos showing the "severely decomposed" bodies of the victims did not violate the petitioner's right to due process because the photos arguably were relevant and probative); Kuntzelman v. Black, 774 F.2d 291, 292-93 (8th Cir. 1985) (per curiam) (holding that the admission of "flagrantly gruesome" photographs did not violate the petitioner's right to due process because the photos "were at least arguably relevant and probative"). In light of the overwhelming evidence of Strong's guilt and the strength of the state's case for the imposition of the death penalty, the Missouri

Supreme Court reasonably concluded that the PowerPoint presentation did not deprive Strong of a fair trial.

## III. Conclusion

The district court's judgment denying habeas relief is affirmed.

_____