[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12488

_____

D.C. Docket No. 9:17-cv-81159-WPD

RONALD KNIGHT,

Petitioner - Appellant,

versus

FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 1, 2020)

Before MARTIN, JORDAN, and NEWSOM, Circuit Judges.

NEWSOM, Circuit Judge:

Death-sentenced Florida inmate Ronald Knight asks this Court to reverse the district court's denial of his habeas corpus petition, which he filed pursuant to 28 U.S.C. § 2254. He alleges that his counsel, Jose Sosa, rendered ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to adequately investigate and present mitigating evidence during the sentencing phase of his capital-murder trial. On state postconviction review, the Florida Supreme Court rejected Knight's claim, concluding that Sosa's performance was not constitutionally deficient. *See Knight v. State*, 211 So. 3d 1, 9–10 (Fla. 2016). Knight thereafter filed a federal habeas petition under § 2254, arguing—among other things—that the Florida Supreme Court's rejection of his ineffective-assistance-of-counsel claim was contrary to clearly established federal law, constituted an unreasonable application of that law, and was based on an unreasonable determination of the facts. The district court denied his petition, and we granted a certificate of appealability on the ineffective-assistance claim.

After careful consideration, we affirm the district court's denial of Knight's petition. Even assuming that Sosa performed deficiently in failing to investigate and present the mitigation evidence that Knight now raises—thus satisfying the first prong of the two-part *Strickland* standard that governs ineffective-assistance claims—we hold that Knight has failed to carry his burden of demonstrating resulting prejudice.

2

Because the Florida Supreme Court didn't reach *Strickland*'s prejudice prong, we consider it here de novo. In doing so, we must reweigh the aggravating evidence found by the judge who sentenced Knight against the totality of the mitigating evidence—including both the evidence originally presented at sentencing and the evidence that Knight now claims his counsel failed to present. While Knight's new evidence may strengthen some of the mitigating circumstances presented at trial, it does not reveal any fundamentally new information or support any new mitigating factors. Against this, the aggravating factors found by the sentencing court remain unchallenged and unaltered. We therefore cannot conclude that there is "a reasonable probability that . . . the sentencing judge . . . would have struck a different balance"—in favor of life, rather than death—had it been able to consider the new evidence. *Porter v. McCollum*, 558 U.S. 30, 42 (2009) (quotation omitted). Accordingly, we find ourselves constrained to affirm the district court's denial of Knight's § 2254 petition.

## I

The grisly facts of Ronald Knight's execution-style murder of Richard Kunkel are not in dispute. On direct appeal, the Florida Supreme Court summarized them as follows:

> Knight and two accomplices, Timothy [Pearson] and Dain [Brennalt] agreed that they would go to a gay bar, lure a man away from the bar,

3

and beat and rob him.  The three found Richard [Kunkel] and invited him to go to a party . . . .  After stopping to eat, the three convinced Kunkel to leave his car parked there and ride to the party with them.  Knight then drove to a secluded area where they stopped twice and got out of the car to urinate.

Before they got back into the car after their second stop, Knight pointed a gun at Kunkel and told him to turn around and take off his jeans.  As Kunkel was complying, Knight fired one shot striking Kunkel in the back.  Kunkel fell to the ground and began crying for help. . . . Knight and [Pearson] then dragged Kunkel's body out of the road.  They left Kunkel to die beside a canal where his body was later discovered.  Knight threatened to kill [Pearson] and [Brennalt] if they told anyone about the murder.

Later that night, the three men went back to . . . Kunkel's car. Knight then stole Kunkel's car and took it for a joy ride to see how fast it would go.  Some time later that evening, the three men broke into Kunkel's house and stole various items.

*Knight v. State*, 770 So. 2d 663, 664 (Fla. 2000).  Four years passed before Knight was indicted for Kunkel's murder.  In the meantime, Knight killed Brendan Meehan under similar circumstances—a crime for which he received a life sentence.  *Knight*, 211 So. 3d at 6.

Knight was eventually charged with the first-degree murder of Kunkel, as well as armed robbery, burglary of a dwelling, and grand theft.  He waived his right to a jury trial and discharged both attorneys appointed to represent him at the guilt phase, Ann Perry and Jose Sosa, choosing instead to represent himself with Sosa acting as standby counsel.  Knight was found guilty on all charges.  *Knight*, 770 So. 2d at 664.

4

At some point during the guilt phase of the trial, Knight agreed that Sosa would represent him during any penalty-phase proceeding. Accordingly, after finding Knight guilty, the court reappointed Sosa as counsel for sentencing, with respect to which Knight once again waived his right to a jury. The trial court ultimately sentenced Knight to death. *Id.* Sosa's conduct during the penalty phase is the issue now before this Court—in particular, whether he was ineffective for failing to adequately investigate and present additional mitigating evidence. *See Porter*, 558 U.S. at 39 ("[C]ounsel had an obligation to conduct a thorough investigation of the defendant's background." (quotation omitted)).

Ineffective-assistance-of-counsel claims are governed by the familiar two-part *Strickland* standard:

> [Petitioner] must show that his counsel's deficient performance prejudiced him. To establish deficiency, [petitioner] must show his "counsel's representation fell below an objective standard of reasonableness." To establish prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."

*Id.* at 38–39 (quoting *Strickland*, 466 U.S. at 688, 694). In support of his claim, Knight asserts that the mitigating evidence that Sosa offered at sentencing—which included testimony from, among others, Knight's mother, his sister, and two expert witnesses who testified about Knight's mental health—paled in comparison to the evidence that Knight, represented by new counsel, eventually adduced at a state-postconviction evidentiary hearing in 2012. There, in addition to Knight's sister

5

and one of his mental-health experts, Knight's lawyer presented testimony from Knight's coconspirators Dain Brennalt and Timothy Pearson, two new expert witnesses, and a counselor from a reform school that Knight attended as a teenager, and also proffered an unverified affidavit from another student who had attended the same school.

## II

As in every death-penalty matter, we must undertake a careful review of the procedural history of Knight's case—complete with summaries of the various hearings and the evidence presented there. Here in particular, where Knight contends that his trial counsel failed to adequately investigate and present sufficient mitigating evidence, our consideration necessarily involves a comparison of the evidence introduced during the sentencing phase of Knight's trial with the proof later adduced on postconviction review. Accordingly, we will first canvass the evidence presented at sentencing and the trial court's sentencing order. Then, following a brief review of Knight's direct appeal, we will examine the state postconviction proceedings—including, most importantly, the evidentiary hearing principally at issue here, as well as the Florida Supreme Court's decision affirming the rejection of Knight's ineffective-assistance-of-counsel claim.

## A

At the penalty phase of his trial, Sosa called Knight's mother and sister, as well as two expert witnesses who had also worked on the earlier Meehan trial—mental-health counselor Susan Lafehr-Hession and psychiatrist Dr. Abbey Strauss.

Knight's mother, Karen Gerheiser, and his sister, Theresa Scott Fowler, testified about Knight's family background and upbringing, detailing his troubled childhood and early drug use, as well as academic and disciplinary struggles. Gerheiser testified about her divorce from Knight's father—in particular, how he took Knight's older brother Michael, but left Knight with her, and how Knight struggled with this rejection and separation from his father and brother. Gerheiser explained how many of Knight's early problems seemed to begin at that time—falling grades and increasing truancy, minor delinquency, and drug use.

According to Gerheiser, Knight's home life further deteriorated following the divorce. Knight, she said, faced a revolving door of stepfathers and boyfriends and often left his mother's home in favor of other accommodations—living with girlfriends, camping in the woods, and eventually staying with his older brother. She explained that in his mid-teens, Knight enrolled in a drug-treatment program and later a school for troubled boys, the Eckerd Youth Center. Gerheiser testified that Knight was injured while at Eckerd, resulting in hospitalization and surgery to amputate a testicle.

7

Gerheiser and Fowler also said, though, that Knight always had adequate clothing and shelter, including an apartment that Gerheiser gave him at age 18. They explained that Gerheiser did the best she could as a single mother, that they supported Knight and encouraged him to go to school, and that Fowler did everything she could to help Knight. Fowler testified that although there was some parental neglect, Knight was not abused.

The sentencing court also heard from two expert mental-health witnesses, both of whom had initially interviewed Knight in connection with the Meehan trial. Susan Lafehr-Hession explained that in 1998 she was a mental-health counselor working toward her Ph.D. She said that in preparation for the Meehan trial, she met with Knight and administered several diagnostic tests to gauge his mental capacity—including the Multiphasic Personal Inventory and Rorschach tests, the Stanford-Binet Intelligence Scale IQ test, a word-association test, the House-Tree-Person drawing test, and the Bender-Gestalt Motor Test. She further explained that before testifying in the Kunkel proceedings, she spoke with Knight again, reviewed his personal and social history, and listened to his mother's testimony.

Lafehr-Hession diagnosed Knight with "a paranoid disorder or paranoia," which, she explained, "is a very pervasive all-inclusive mental illness, very severe, very debilitating, does not change, does not get better except when the person is in a highly structured setting." She agreed with Sosa's characterization of Knight as

8

"a very disturbed paranoid person" with a "very severe and debilitating type of an illness"—"[s]evere emotional disturbances . . . very distrusting and suspicious kind of a person, emotionally unstable and aggressive, hostile." And she postulated that the focus of Knight's paranoia stemmed from "whatever happened at [the Eckerd Youth Center] that ended up in having his testicle amputated." She explained that a paranoid person like Knight harbors "a persistent bearing of grudges that grow and continue like a snowball rolling down a hill."

Sosa specifically asked Lafehr-Hession whether any of Florida's statutory mitigating factors applied to Knight. *See* Fla. Stat. Ann. § 921.141(6) (1996). Lafehr-Hession agreed that Knight suffered from both extreme mental or emotional illness or disturbance and a diminished capacity to appreciate the criminality of his conduct or conform his conduct to the law. As to the former, she testified that Knight is "always under the influence of extreme emotional distress and disturbance, that's the very nature of the disturbance, and it's ever present and it's always there." And as to the latter, she stated that Knight was not "able to make choices, willful choices outside of that mental illness." On cross-examination, though, Lafehr-Hession also acknowledged the existence of statutory aggravating factors. *See* Fla. Stat. Ann. § 921.141(5) (1996). She agreed that Knight had the capacity to carefully plan a crime, knew right from wrong, and had the ability to conceal misdeeds.

9

Next up was psychiatrist Dr. Abbey Strauss, who, like Lafehr-Hession, first evaluated Knight in preparation for the Meehan trial. During his Kunkel-trial testimony, Strauss discussed his preparation for both trials, his evaluations of Knight, and his diagnosis.

Strauss explained that prior to testifying in the Meehan trial, he conducted a background investigation, reviewed medical records from jail and the Eckerd Youth Center, read a private investigator's report, and met with Knight twice. He further explained that before testifying in the Kunkel trial, he met with Knight twice more and read a background report that included Lafehr-Hession's Kunkel-trial testimony. He did not, however, speak to Knight's parents, siblings, neighbors, or associates.

At Knight's sentencing hearing for the Kunkel murder—at issue here—Strauss echoed Lafehr-Hession's diagnoses, noting a strong suspicion of a paranoia disorder. He added that Knight was an "extremely volatile, emotionally intense young man . . . who has no easy control of the emotions that he has." Like Lafehr-Hession, he also testified to applicable statutory mitigating factors, agreeing that Knight was under extreme mental or emotional distress at the time of the crime and was unable to conform his conduct to the requirements of the law. Knight's history, Strauss testified, "[c]ombine[d] . . . with this undercurrent of a basic pathology of a paranoia disorder," meant that "his ability to really understand and

10

truly project out ramifications of his behavior is very limited." Like Lafehr-Hession, though, Strauss also acknowledged aggravating factors. While insisting that Knight was not a cold, calculated killer, Strauss agreed that Knight had the ability to plan a crime and to conceal misdeeds.

After hearing from Knight's family and mental-health experts, the trial court sentenced him to death. *Florida v. Knight*, No. 97-5175 (Fla. Palm Beach County Ct. May 29, 1998) (Sentencing Order). At the time, before a Florida court could impose a death sentence, it had to conclude in a written order that "there [were] insufficient mitigating circumstances to outweigh the aggravating circumstances." Fla. Stat. Ann. § 921.141(3)(b) (1996). The court had to consider fourteen enumerated aggravating factors and seven mitigating factors, as well as "any other factors in the defendant's background that would mitigate against imposition of the death penalty." Fla. Stat. Ann. § 921.141(6)(h) (1996).

In its sentencing order, the court found two statutory mitigating factors and gave weight to several non-statutory factors under § 921.141(6)(h)'s catchall. From among the enumerated factors, the court found that the killing was committed while Knight was under the influence of extreme mental or emotional disturbance, § 921.141(6)(b), and that Knight's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law

11

was "somewhat" impaired, § 921.141(6)(f).[1] Among non-statutory factors, the court gave some weight to his troubled childhood as well as the facts that he had the love and support of his family and that death would be a disparate punishment compared to the lighter sentences imposed on his coconspirators. In addition, although the court didn't list Knight's paranoia disorder as a stand-alone factor, it gave substantial mitigating weight to that consideration in its treatment of the mental-or-emotional-disturbance and impairment factors.

On the other side of the ledger, the court found four aggravating factors under § 921.141(5)—(1) that Knight had previously been convicted of killing Meehan; (2) that the Kunkel murder was committed during the course of a robbery; (3) that it was committed for pecuniary gain; and (4) that it was cold, calculated, and premeditated. (The court merged the robbery and pecuniary-gain considerations and therefore gave weight to only three aggravating factors.) Of those, the last was perhaps the most damning. With respect to that factor, the sentencing court observed in its written order: "The defendant chose the ruse to lure the victim, chose the victim, chose the time and place of the shooting and the

---

[1] Although Fla. Stat. Ann. § 921.141(6)(f) (1996) required a judge to find that the defendant's capacity to appreciate criminality and conform conduct was "substantially" impaired, the sentencing court here "was unable to find that [Knight's] capacity was *substantially* impaired based upon the experts' testimony," as "each concluded that he could distinguish right from wrong." Nonetheless, the court "g[ave] some [mitigating] consideration to the fact that [Knight's] capacity was *somewhat* impaired." *See* Knight, No. 97-5175 (Sentencing Order) (emphasis in original).

12

manner of death for Richard Kunkel.  The execution-style slaying of Kunkel by the defendant was carried out in a cold, calculated and premeditated manner.  There was no possible claim of justification or excuse for the defendant's actions."  *Knight*, No. 97-5175 (Sentencing Order).

Considering all of the evidence, the court concluded that "the aggravating circumstances far outweigh[ed] the mitigating circumstances and tilt[ed] the scales of justice decidedly toward death."  *Id.*  The court therefore sentenced Knight to die for his crime.  On direct appeal, the Florida Supreme Court unanimously affirmed.  *Knight*, 770 So. 2d at 665.  The United States Supreme Court subsequently denied Knight's petition for certiorari.  *Knight v. Florida*, 532 U.S. 1011 (2001).

**B**

After his direct appeals were rejected, Knight commenced state postconviction proceedings.  Although only one of the claims raised there has survived, Knight initially raised twenty-one, and the state postconviction court granted him an evidentiary hearing on most of them.  *See Knight*, 211 So. 3d at 7 (reviewing procedural history).  Our ineffective-assistance-of-counsel inquiry centers on the evidence presented at that hearing, which the court held in 2012.

**1**

During the postconviction hearing, Knight presented his sister Theresa Scott Fowler and Dr. Abbey Strauss, both of whom had also testified at sentencing, as well as several additional lay and expert witnesses. The lay witnesses testified concerning Knight's background and upbringing—in addition to Fowler, they included Knight's codefendants Dain Brennalt and Timothy Pearson, as well as a counselor at the Eckerd Youth Center named Zebedee Fennell. Knight also presented an affidavit signed by a man named Keith Williams who claimed to have attended Eckerd with a boy named Ronald Knight.

The Eckerd Youth Center featured prominently in both Pearson's testimony and the Williams affidavit. Pearson, Knight's closest childhood friend, didn't attend Eckerd but claimed that it had a reputation as a "gladiator school," full of fights: "[I]t was the one place in Florida as a juvenile you did not want to get sent." Williams's affidavit alleged that a boy named Ronald Knight had been physically and sexually abused at Eckerd, suffering weekly rapes and beatings from fellow students. Pearson testified that after Knight returned home, they discussed the fights at Eckerd, but he said that Knight didn't mention (and wouldn't have mentioned) any sexual abuse.

Zebedee Fennell, a counselor and later a program administrator at Eckerd, testified that although he recalled an African-American boy at Eckerd named

Ronald Knight, he didn't know the defendant, who is white. Accordingly, he said, he could testify only to the general conditions at Eckerd, which he acknowledged included some violence.

Pearson also testified about Knight's drug use. He said that he and Knight started smoking marijuana at around age nine, and that by the time they were teenagers they were smoking daily, drinking regularly, and experimenting with cocaine, acid, and mushrooms. Eventually, he said, they started heavily abusing drugs, including crack and powder cocaine.

Dain Brennalt echoed much of Pearson's drug-related testimony. He said that he first met Knight and Pearson as a customer, buying marijuana from them. Eventually, he testified, the three began smoking together daily and using powder cocaine weekly. Brennalt recalled that Knight was "a lot more relaxed when he was on cocaine." Brennalt maintained, however, that although they had used cocaine in the days leading up to the Kunkel murder, Knight had not used any on the day of the killing.[2]

Finally—among the lay witnesses—Knight presented (again) his sister, Theresa Scott Fowler. In her postconviction testimony, she explained that there

---

[2] Brennalt gave ambiguous testimony regarding whether Knight used marijuana on the day of Kunkel's murder. When asked whether he smoked marijuana on that day or observed Knight or Pearson doing so, he responded, "Yes, I did." Brennalt's answer could mean either that he smoked marijuana—implying that the others did not—or, by contrast, that he saw the others smoking. In any event, Brennalt testified clearly that Knight had not used any cocaine on the day of the murder.

15

was more extensive childhood neglect than she had described at sentencing. She discussed Knight's relationship with his parents—in particular his father, who couldn't handle him and sent him back to live with his single mother, where he encountered a succession of boyfriends and stepfathers. Fowler said that one of those boyfriends wouldn't allow Knight to live with them, so Knight lived with friends and in treehouses in the woods for a time. She also testified to indications of possible abuse—one boyfriend, she said, was "very touchy-feely with [her]," and another displayed "inappropriate behavior" with her sister. She concluded, in sum, that their childhood had "no love, there was no respect, there was no parenting skills at all."

Knight also presented three expert witnesses at the postconviction hearing. Dr. Jonathan Lipman, a neuropharmacologist, testified—in summary—that Knight must have been under the influence of drugs at the time of the murder. He testified about Knight's history of drug abuse, its extent, and its possible effects. Lipman explained that in preparation for his testimony he met with Knight twice, reviewed documents, and interviewed witnesses. He noted the importance of third-party witnesses in assessing drug use, given the tendency of users to underestimate their own use and symptoms.

In light of the extensive drug-use described in Pearson and Brennalt's testimony, Lipman concluded that that Knight must have been "profoundly under

16

the influence of cocaine plus alcohol at the time of the offense and leading up to it." He testified, in particular, that the murder was the culmination of a four-day cocaine binge. Lipman also believed that the effects of Knight's paranoia combined with his drug use to produce "a nexus where these two things come together that causes an amplification." Paranoid people, he said "are much more vulnerable than [the] rest of us to experiencing the adverse psychotoxic effects of cocaine." He concluded that Knight likely suffered illusions, hallucinations, and delusions while using drugs. In Lipman's opinion, there was far more extensive drug use than the evidence at sentencing revealed. All of this led Lipman to agree with the sentencing court that Knight was severely disturbed at the time of the murder and unable to conform his conduct to the requirements of the law. Lipman believed, however, the sentencing court lacked a full understanding of the *extent* of these factors. According to Lipman, "cocaine plus alcohol rather massively increases impulsivity." Because Lipman is not a psychiatrist and was hired only to assess Knight's drug use, he didn't offer a psychiatric diagnosis of Knight.

Dr. Phillip Harvey testified about "a series of cognitive tests" that he had conducted on Knight, "looking at intellectual functioning, screening for psychological impairment, testing reading ability, and measuring his processing speed." Harvey explained his view that "all these different tests . . . and subscales" demonstrated "remarkably consistent performance, at pretty much the median of

17

the overall distribution of intelligence." According to Harvey, the tests showed that Knight was "clearly in the average range of performance." As a result, he said, the "tests [didn't] reflect any evidence of any decline in functioning from a higher/better level, like you might see if someone had had a significant traumatic brain injury, or an adverse impact of substance abuse." In fact, Harvey expressed surprise at the lack of impairment, given Lipman's testimony opining on Knight's extensive history of drug abuse. Ultimately, like Lipman, Harvey didn't offer any specific diagnosis of Knight. When pressed to discuss possible PTSD, for example, Harvey noted that Knight had denied any history of trauma or sexual abuse, which in Harvey's opinion foreclosed the possibility of PTSD. Furthermore, Harvey testified that he had not been hired to formally diagnose Knight.

Finally, Dr. Abbey Strauss testified once again, explaining both his psychiatric diagnosis of Knight as well as his preparation for the 1998 sentencing hearing. In terms of preparation, Strauss reiterated that he had been involved in the Meehan trial and was therefore familiar with Knight long before Sosa contacted him about the Kunkel trial. He said that his investigation was never rushed and that he was never denied any time or resources by Sosa or the court. In the same vein, he confirmed that his presentation to the sentencing court was not "truncated" in any way. On the contrary, Strauss emphasized his recollection that the

18

sentencing judge "was very hungry for as much information as he could get." In fact, the only difficulty that Strauss could recall resulted from Knight's own non-cooperation during evaluations.

Strauss testified that in preparation for the postconviction hearing, he reviewed the 1998 trial record, Knight's new witnesses' testimony, and the Williams affidavit. None of it, he said, altered his original paranoia diagnosis. Strauss testified, for instance, that while the Williams affidavit "may have confirmed some of [his] suspicions about the etiology of [Knight's] conditions," it did not result in any change to his expert opinion. In addition, he said that "the reaffirmation of [his] diagnostic notion was reinforced by speaking to Dr. Lipman and [Dr.] Harvey," Knight's new postconviction experts. In sum, Strauss explained that the postconviction evidence was consistent with and confirmed his original paranoia diagnosis—he agreed that his "global opinions" were "really identical to what [he] expressed . . . at the penalty phase of this case." The same was true of the mitigating factors—in Strauss's opinion, due to his paranoia, Knight had an impaired ability to conform his conduct to the law and was emotionally disturbed, both factors that the sentencing court had given mitigating weight.

**2**

After the multi-day hearing, the state postconviction court issued its ruling denying all of Knight's claims—including, as relevant here, his ineffective-assistance-of-counsel claim.

Significantly for our purposes, the postconviction court made several credibility determinations. *See Consalvo v. Sec'y for Dept. of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) ("Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review."). First, the court "f[ound] Pearson's testimony to lack credibility and credit[ed] the testimony of Brennalt," who "was emphatic that they did not use drugs on the day of the homicide, though they had in the days leading up to it." Second, the court "d[id] not find Dr. Lipman's testimony to be credible." "Not only," the court found, "were Dr. Lipman's assertions based upon the testimony of another non-credible witness"—meaning Pearson—but Lipman's expertise and methods were lacking. In particular, Lipman "admit[ted] that there was no toxicological evidence of [Knight's] drug abuse and that any information related to the abuse came solely from reports of people." And, the court observed that "[d]uring the hearing, [Knight himself] objected to the use of any information used by Dr. Lipman because he did not complete his evaluation of [Knight] nor did [Knight] believe he could 'offer anything relevant to [his] claim.'" Third, and finally, the court "gave

20

little to no weight to" Fennell's testimony, which "was solely related to the conditions at Eckerd at the time [Knight] may or may not have been present."

The state postconviction court ultimately held that Knight "ha[d] no basis to assert a change in the outcome of the penalty phase or change in which aggravators were used when all that was presented was a reiterated diagnosis and new experts, one of which submitted a non-clinical observation not supported by objective data." Accordingly, it denied Knight's ineffective-assistance claim.

## C

Knight appealed six of his postconviction claims to the Florida Supreme Court, which affirmed the trial court's denial. *Knight*, 211 So. 3d at 19. Concerning Knight's ineffective-assistance-of-counsel claim, the court correctly framed the two-part *Strickland* analysis—which it labeled "deficient performance and prejudice"—and proceeded to analyze the postconviction witnesses' testimony in connection with the first, performance prong. *Id.* at 8–10.

The state supreme court began by noting that it would be "highly deferential to the postconviction court on issues of credibility" and would defer to "factual findings where supported by competent, substantial evidence." *Id.* at 8–9. The court therefore deferred to the postconviction court's finding that Lipman and Pearson were not credible and agreed that Fennell's testimony should be given "little to no weight." *Id.* at 10.

21

Considering the remainder of the postconviction evidence, the court held that "Knight ha[d] not demonstrated deficient performance as to any aspect of [the] ineffectiveness claim" and, therefore, was "not entitled to relief." *Id.* at 10. With respect to the experts, the court concluded that "[p]ostconviction counsel's ability to find additional experts who, [he] argue[d], provide[d] more favorable testimony d[id] not make penalty phase counsel's performance deficient." *Id.* at 9 (citing *Dufour v. State*, 905 So. 2d 42, 58 (Fla. 2005)). The court did not specifically analyze each lay witness but, after dismissing Pearson and Fennell, concluded that the remaining testimony failed to establish deficient performance. *Id.* at 10. Although Fowler's postconviction testimony, for example, presented Knight's difficult childhood in greater detail than she had at sentencing, the state supreme court agreed with the postconviction court that "counsel cannot be deemed ineffective for failing to present mitigation that only became available after a family member had time to reflect on her original testimony." *Id.*

The court did not analyze *Strickland*'s prejudice prong. Given that "Knight ha[d] not demonstrated deficient performance as to any aspect of this ineffectiveness claim," the court held that "he [was] not entitled to relief" and therefore, that "[a] discussion of prejudice [was] unnecessary." *Id.*

22

## III

Having exhausted his avenues for relief in state court, Knight filed a federal habeas corpus petition under 28 U.S.C. § 2254.  The district court denied all claims and, separately, denied Knight a certificate of appealability.  We then granted Knight a certificate of appealability with regard to one claim—the ineffective-assistance-of-counsel claim now before us.

## A

*Strickland* requires an ineffective-assistance claimant "to show both that his counsel provided deficient assistance and that there was prejudice as a result," and in considering the claim, the reviewing court is charged with evaluating the lawyer's performance through a "most deferential" lens.  *Harrington v. Richter*, 562 U.S. 86, 104, 105 (2011) ("Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.").  Under § 2254(d), this *Strickland*-based deference concerning a lawyer's performance is "doubl[ed]"—compounded.  *Id.* at 105 (quotation omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  "The

question," therefore, "is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

Things are a little bit different here because the Florida Supreme Court expressly declined to analyze *Strickland*'s second prong, prejudice. *Knight*, 211 So. 3d at 10. Although some portions of that court's opinion might be understood as a mixed assessment of both prongs—at times suggesting, perhaps, that Sosa's performance wasn't deficient *because* Knight hadn't demonstrated prejudice—we will take the Florida Supreme Court's decision—and its statement that because "Knight ha[d] not demonstrated deficient performance . . . [a] discussion of prejudice [was] unnecessary"—at face value. *Id.* Accordingly, "our review is not circumscribed by a state court conclusion with respect to prejudice," *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), and we must review that prong de novo. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim de novo." (citation omitted)). Any analysis of deficiency—which the Florida Supreme Court expressly addressed—of course remains subject to the "doubly deferential" standard.[3]

---

[3] To be clear, this case provides us no occasion to "look through" the Florida Supreme Court's decision and defer to the state trial court's prejudice determination under *Wilson v. Sellers*, 138 S. Ct. 1188, 1196 (2018). *Wilson* addressed the question how a federal habeas court should deal with the circumstance in which a state supreme court's decision "does not come accompanied by reasons"—where, for instance, it consists in only "a one-word order." *Id.* at 1192. Here, by contrast, we are confronted with a reasoned opinion from the Florida Supreme Court that

**B**

We think it simplest and most straightforward to start, in this case, from the other end of the *Strickland* standard. For purposes of our analysis, we will simply assume (without deciding) that Sosa's "representation fell below an objective standard of reasonableness" sufficient to establish deficient performance, *Porter*, 558 U.S. at 38 (quoting *Strickland*, 466 U.S. at 688), and focus our assessment on the prejudice prong. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). For reasons we will explain, we conclude that even under a de novo standard, Knight has failed to meet his burden to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Porter*, 558 U.S. at 38–39 (quoting *Strickland*, 466 U.S. at 694).

In evaluating prejudice, our task is to review the new evidence presented by Knight and then "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Cullen v. Pinholster*, 563 U.S. 170, 198 (2011) (quoting *Wiggins*, 539 U.S. at 534). "[T]he question is whether there is a

---

addresses Knight's ineffective-assistance claim on the merits. We take the Florida Supreme Court's decision just as we find it—and under *Wiggins* and *Rompilla*, because that court declined to address *Strickland*'s prejudice prong, we must consider that issue de novo. *See also Johnson v. Secretary*, 643 F.3d 907, 930 & n.9 (11th Cir. 2011) (likewise explaining that where a state supreme court's decision addresses only one of *Strickland*'s two prongs, a federal habeas court must consider the unaddressed prong de novo).

25

reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* (ellipses in original) (quoting *Strickland*, 466 U.S. at 695).

After carefully comparing the evidence presented at Knight's sentencing to that adduced on postconviction review, we conclude that the state trial court did not err when it concluded at sentencing that the aggravating circumstances "far outweigh the mitigating circumstances." *Knight*, No. 97-5175 (Sentencing Order). Knight's postconviction evidence confirms the mitigation evidence that Sosa originally presented, but it does not support any new mitigating factors. At the same time, the aggravating factors found by the sentencing court remain unchallenged and unaltered. As we will explain, therefore, the overall balance remains essentially unchanged, meaning that there is no "reasonable probability" that the sentencing court would have opted for life, rather than death. *Porter*, 558 U.S. at 38–39 (quoting *Strickland*, 466 U.S. at 694).

### 1

We will first examine the mitigation side of the ledger. None of Knight's postconviction evidence establishes any new mitigating factors. Recall that the sentencing court found two statutory mitigating factors—(1) that Knight was under the influence of extreme mental or emotional disturbance and (2) that his capacity to appreciate the criminality of his conduct or conform it to the requirements of the

26

law was impaired. It also gave weight to several non-statutory mitigating factors—among them Knight's troubled childhood, that he had the love and support of his family, and that a death sentence would be disparate compared to the lighter sentences given to his coconspirators.

Knight initially argues that his postconviction evidence establishes a greater drug dependency than the sentencing evidence revealed and possible childhood sexual abuse of which the sentencing court was unaware. We are not convinced. Knight's contentions are neither well supported nor particularly revelatory.

The drug-related argument rests on a shaky foundation—namely, on the testimony of Pearson, Brennalt, and Lipman. Like the Florida Supreme Court, we must defer to the state postconviction court's credibility determinations. *See Knight*, 211 So.3d at 9–10; *Consalvo*, 664 F.3d at 845 ("Federal habeas courts have no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." (quotation omitted)).[4] Because those determinations are supported by competent and substantial evidence, we defer to the state courts' decisions to accord Pearson and Lipman's testimony little, if any, weight.

---

[4] To be clear, that is so even under a de novo standard. *See Consalvo*, 664 F.3d at 845 ("We consider questions about the credibility and demeanor of a witness to be questions of fact.").

The remaining drug-related testimony adds little. Brennalt testified that he met Knight through drug dealing and that they often used cocaine and marijuana together. The sentencing court, however, was well aware of Knight's drug abuse. Knight's mother, Gerheiser, testified that he began using drugs soon after his father left and that he was even sent to rehab as a teenager. While Brennalt's testimony may fill in some of the details of Knight's drug use, it doesn't add anything truly new. More importantly, while Lipman's expert testimony focused on the effects of Knight's cocaine use, Brennalt was insistent that Knight had *not* used cocaine on the day of Kunkel's murder.

The alleged abuse at Eckerd—while more explosive and, if true, tragic—is not particularly well-supported, either. The lone evidence of it is in the form of an unauthenticated affidavit from a one-time student at Eckerd, Keith Williams, who alleged that a boy named Ronald Knight suffered horrific abuse while there. Williams's affidavit, though, doesn't provide any real details about the "Ronald Knight" that it describes—*e.g.*, race, hair or eye color, years of attendance, etc.— and we thus have no firm indication that the individual named there is in fact the defendant. The uncertainty is compounded by the testimony of Zebedee Fennell, an Eckerd administrator, who stated that although there was an African-American boy named Ronald Knight at the school, he didn't recall the defendant, who is white. Moreover, the postconviction court excluded the Williams affidavit on

28

hearsay grounds, and in evaluations with his experts, Knight himself denied that he had suffered any traumatic abuse.

Even if we were to accept the Williams affidavit as true for the purposes of our analysis, it is, as Dr. Strauss testified on postconviction, merely "consistent with some of the suspicions that [experts] had [in 1998] about what happened to Mr. Knight when he was a teenager." Those "suspicions" were aired at sentencing. Mental-health counselor Susan Lafehr-Hession testified that Knight's mental duress "likely had to do with . . . whatever happened at [Eckerd] that ended up in having his testicle amputated." Knight's mother Gerheiser had also discussed his injury with the sentencing court, though she blamed it on an accident. Even after reading Williams's affidavit, Strauss was adamant that while it offered an explanation "about the etiology of [Knight's] conditions," it did not "suggest that anything ha[d] changed" in his diagnosis.

Strauss's testimony regarding the alleged abuse—that it strengthened and confirmed his earlier conclusion but didn't fundamentally change anything—is consistent with the balance of his postconviction testimony. After hearing from the new witnesses, reading the new experts' reports, and reviewing all other available evidence, Strauss agreed that his "global opinions [were] really identical to what [he] expressed to Judge Garrison in 1998, at the penalty phase of the case." His diagnosis remained unaltered—Knight, he said, suffered from an "undercurrent of

29

a paranoid disorder" that involved an inability to trust others and supported findings that Knight was under extreme mental or emotional distress at the time of the murder and was unable to conform his conduct to the law. That is *exactly* what the sentencing court found in 1998.

The remainder of the postconviction witnesses likewise offered nothing in the way of mitigation that was fundamentally new or particularly revelatory. Dr. Phillip Harvey, who administered a series of cognitive tests to Knight, simply found that Knight was in the average range of intelligence and ability. Knight can hardly be said to have been prejudiced by Sosa's failure to include such test results at sentencing.

So too with respect to Knight's sister, Theresa Scott Fowler. Fowler, the only witness other than Strauss to appear at both the sentencing and postconviction hearings, stated during the latter that there was more extensive childhood neglect than she had previously described. For example, whereas she testified at sentencing that their mother Karen Gerheiser did the best that she could as a single parent and that despite some neglect there was never any abuse, at the postconviction hearing her opinion of Gerheiser had soured considerably—there was "no love," "no respect," and "no parenting skills at all." As she did at sentencing, she discussed the revolving door of stepfathers and boyfriends but offered more detail—some of them may have abused Fowler and her sister, and

one refused to let an adolescent Knight live with them.  Fowler's postconviction

testimony adds detail and texture, but nothing fundamentally new.  The sentencing

court had more than enough mitigating evidence before it to find that Knight

"came from a broken home and had a less than ideal childhood."  *Knight*, No. 97-

5175 (Sentencing Order).  What the sentencing court found dispositive, however,

was the lack of "evidence or testimony that this had any bearing on the defendant's

criminal behavior in this case."  *Id.*  Fowler's postconviction testimony adds little

on that score.

* * *

At the end of this exhaustive review of Knight's postconviction evidence,

we are left with the same mitigating factors that the sentencing court credited.

First, we have the statutory factors—that Knight suffered from extreme mental or

emotional distress and an impaired ability to conform his conduct to the

requirements of the law, both connected to his paranoia.  Second, we have the

"other factors in the defendant's background that would mitigate against

imposition of the death penalty," Fla. Stat. Ann. § 921.141(6)(h) (1996)—among

them (1) that Knight had a troubled childhood, which began with his father's

abandonment, featured a rotation of father-figures of dubious repute, and

culminated in failed remedial youth programs; (2) that despite this past, he had the

love and support of his family; and (3) that a death sentence would be disparate

31

compared to Knight's coconspirators Brennalt and Pearson, who both received only short sentences for their parts in Kunkel's murder. The only impact that the postconviction evidence can fairly be said to have is in filling out the details pertaining to these same, preexisting factors. *See Cullen*, 563 U.S. at 200–01 (noting that, because "[petitioner's] 'new' evidence largely duplicated the mitigation evidence at trial," and "basically substantiate[d] the testimony of" his family, there was "no reasonable probability that [it] would have changed the jury's verdict").

Knight's failure to adduce significant new mitigating evidence stands in contrast to cases in which courts have concluded that petitioners met their burden under the prejudice prong. In *Rompilla v. Beard*, for example, the petitioner's postconviction evidence established, for the first time, that he suffered from mental retardation due to organic brain damage (and probably fetal alcohol syndrome, as well), a substantially impaired ability to appreciate criminality and conform conduct to the law, alcoholism, and possible schizophrenia. 545 U.S. at 391–93. In those circumstances, it went "without saying that the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [the defendant's] culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Id.* at 393 (quotations omitted); *see also Porter*, 558 U.S. at 33

32

("Unlike the evidence presented during Porter's penalty hearing, which left the jury knowing hardly anything about him other than the facts of his crimes, the new evidence described his abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity.").

By contrast, Knight's "new" mitigation evidence merely strengthens—corroborates, confirms—the mitigating circumstances that Sosa presented at sentencing. The credible postconviction testimony is largely duplicative of the sentencing-phase evidence, and establishes no new mitigating factors.

**2**

Knight's failure to bring forward any truly new mitigating evidence is stacked against the aggravating factors that the sentencing court found, all of which remain unchallenged. First, Knight "was previously convicted of another capital felony" for the murder of Brendan Meehan. Fla. Stat. Ann. § 921.141(5)(b) (1996). Second and third, he murdered Kunkel while in the commission of a robbery, § 921.141(5)(d), and "for pecuniary gain," § 921.141(5)(f). And fourth, the execution-style murder "was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification." § 921.141(5)(i). What the sentencing court said in 1998 remains true today: "The defendant chose the ruse to lure the victim, chose the victim, chose the time and place of the

33

shooting and the manner of death for Richard Kunkel. . . . There was no possible claim of justification or excuse for the defendant's actions." *Knight*, No. 97-5175 (Sentencing Order). Not only did these factors "far outweigh" the mitigating evidence, but any one of them "standing alone, would outweigh the minimal mitigating evidence in this case." *Id.*

In this respect, this case is critically different from *Porter*, on which Knight heavily relies. There, during its review, the Florida Supreme Court had eliminated the aggravating factor that the defendant's crime was especially "heinous, atrocious, or cruel," finding it unsupported by the evidence. *Porter v. State*, 564 So. 2d 1060, 1063 (Fla. 1990); *see* Fla. Stat. Ann. § 921.141(5)(h) (1996). Accordingly, in its analysis of prejudice the United States Supreme Court concluded that the new mitigating factors established by Porter's postconviction evidence, combined with the "reduced [ ] ballast on the aggravating side," demonstrated "a reasonable probability that the advisory jury—and the sentencing judge—would have struck a different balance." *Porter*, 558 U.S. at 42 (quotation omitted). Here, by contrast, the aggravating factors that underlay Knight's death sentence remain unchallenged and unchanged.

\* \* \*

Unlike the petitioners in the cases on which he relies, Knight's postconviction hearing evinced no new mitigating factors, and he does not

34

challenge any aggravating factor.  Even if we believed Sosa's performance to be deficient, Knight has failed to carry his burden to establish a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.  Because he has failed to establish prejudice, his ineffective-assistance-of-counsel claim fails.

## IV

Because we conclude that Knight has failed to prove the prejudice component of his ineffective-assistance-of-counsel claim, we affirm the district court's denial of his § 2254 habeas petition.

**AFFIRMED.**