# NO. 12-20-00114-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *DWIGHT DEAN ROSAMOND, APPELLANT* | § | *APPEAL FROM THE* |
| *V.* | § | *COUNTY COURT AT LAW* |
| *THE STATE OF TEXAS, APPELLEE* | § | *VAN ZANDT COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Dwight Dean Rosamond appeals his conviction for murder. In three issues, he alleges trial counsel provided ineffective assistance of counsel during sentencing, the trial court abused its discretion when it overruled his motion for new trial, and the evidence is insufficient to support the jury's verdict finding him guilty of murder. We affirm.

### BACKGROUND

Appellant lived on rural acreage in Van Zandt County, Texas. Appellant rented a mobile home, and later, a recreational vehicle (RV) located on his property to Rickey Ray White II and his girlfriend. Appellant resided with his wife and children in a separate storage building or barn-type structure on the property.[1] White moved out shortly before the event that caused his death.

In the dark early morning hours of March 15, 2018, White and his friend Alan Vaughn trespassed on Appellant's property to retrieve White's tools and other property left behind after he moved out. White and Vaughn consumed methamphetamine (meth) the previous day, and White ingested more meth earlier that morning prior to the pair's unannounced foray onto

---

[1] Appellant's property can best be described as a "junkyard" containing numerous buildings and items such as vehicles, farm implements, and equipment.

Appellant's property. Although not entirely clear, it appears that White and Vaughn were on Appellant's property for over two hours. At some point, Vaughn "passed out" on a recliner located outside in the yard. Once he awoke, he relocated to his truck on the road and fell asleep again.

Meanwhile, Appellant woke to the sound of his dogs barking and went outside to determine what alerted them. Appellant did not see anyone and was unable to determine what caused the dogs to bark. Later, the dogs continued to bark, and Appellant went back outside. Appellant returned inside, explaining to his wife that he believed he saw some lights or a reflection in the window of the mobile home. He retrieved his shotgun, told his wife to call 911, and went back outside.

Appellant's wife called 911 and told the dispatcher that there was a prowler, their dogs were "going crazy," and that her husband went outside to investigate. After approximately seven minutes, there was an audible gunshot on the call, and Appellant's wife told the dispatcher that she thought her husband just shot the prowler and to please hurry. Appellant's wife thereafter repeated on the call what he told her—namely that the prowler "came after him." At approximately the ten-and-a-half-minute point of the call, Appellant's wife identifies White as the person that Appellant shot. Appellant thereafter went to the road and held Vaughn at gunpoint.

Two sheriff's deputies arrived less than five minutes later. White was still alive and conscious, and the deputies unsuccessfully attempted to stop White's bleeding gunshot wound. White's pulse eventually faded, and paramedics arrived, who were unsuccessful in their extensive attempts to revive White, and he died.

Appellant voluntarily conducted an interview in which he claimed self-defense. He explained that someone came running at him while yelling obscenities and holding a flashlight, so he shot him because he feared for his life. Appellant was subsequently released after the interview, but after further investigation, he was indicted for murder, to which he pleaded "not guilty." The jury found him "guilty" of murder as charged and sentenced him to thirty-five years of imprisonment. Appellant filed a motion for new trial, and after an extensive hearing, the trial court denied the motion. This appeal followed.

In his third issue, Appellant contends the evidence is insufficient to support his conviction for murder because it was improper for the jury to implicitly reject his theory of deadly force self-defense.

## Standard of Review

In reviewing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 902 n.19 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). This standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010). The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Brooks*, 323 S.W.3d at 899.

When the record supports conflicting inferences, we presume that the fact finder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are treated equally. *Id.* Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 13.

Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See id.* Juries are permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *Id.* at 15. Juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. *Id.* An inference is a conclusion reached by considering other facts and deducing

3

a logical consequence from them, while speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id.* at 16.

**Applicable Law**

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2019). A person acts in self-defense in using force against another when and to the degree he reasonably believes the force is necessary to protect himself from the other's use or attempted use of unlawful force. *Id.* § 9.31(a) (West 2019). A "reasonable belief" is that which "would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42) (West 2021). The use of force is not justified if the actor is responding to force that he himself provoked, unless the actor abandons the encounter and the other nevertheless continues or attempts to use unlawful force against the actor. *Id.* § 9.31(b)(4). The Texas Penal Code justification for self-defense focuses on the existence of some necessity, the circumstances under which the force was used, the degree of force used, and the type of conduct against which the force was used. *Kelley v. State*, 968 S.W.2d 395, 399 (Tex. App.—Tyler 1998, no pet.). The amount of force used must be in proportion to the force encountered. *Id.* The use of deadly force is justified if the use of force is justified under Section 9.31 and the actor reasonably believes deadly force is necessary to protect himself from the other's use or attempted use of unlawful deadly force. TEX. PENAL CODE ANN. § 9.32(a) (West 2019).

The issue of self-defense is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected a defendant's self-defense theory. *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). The jury's implicit rejection of a defendant's self-defense theory must be supported by sufficient evidence. *Id.* at 914. In reviewing the sufficiency of the evidence to support the jury's rejection of self-defense, we examine all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense and could have found against the defendant on the self-defense issue beyond a reasonable doubt. *Id.*

When a defendant raises self-defense, he bears the burden of producing some evidence to support his defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once the defendant produces some evidence supporting his defense, the state then bears the burden of persuasion to "disprove the raised defense." *Id.* The burden of persuasion does not require the

production of evidence; it requires only that the state prove its case beyond a reasonable doubt. *Id.* Moreover, "[d]efensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the [s]tate's evidence insufficient since the credibility determination of such evidence is solely within the jury's province[,] and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914. When the evidence is conflicting, we presume that the fact finder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Clayton*, 235 S.W.3d at 778.

**Discussion**

Appellant argues that the State failed to discharge its burden to disprove his claim of deadly force self-defense beyond a reasonable doubt, and that the jury's implicit rejection thereof is insufficient to support its finding of guilt for the charged offense of murder.

Appellant was White's former landlord. White and his girlfriend resided in a mobile home, and later an RV, on the property for several months prior to his death but had recently moved to another residence. White paid Appellant money when he could and performed odd jobs for Appellant as compensation for rent. Appellant and another tenant renting from Appellant testified that it was not unusual for White and others to come and go from the property at all hours of the night, thereby allowing the jury to infer that this conduct was not necessarily unusual or alarming to Appellant. However, Appellant stated that he helped White in the middle of the night and early morning hours on past occasions with tasks such as "jumping" his truck, but claimed that White would call, text, knock on Appellant's door, or otherwise announce his presence when he needed help. White did not announce his presence on the night in question.

White and Vaughn consumed meth the previous day, and White ingested more meth shortly before they decided to travel to Appellant's property to retrieve items belonging to White and his girlfriend. It appears that White and Vaughn had been at the property for over two hours. Vaughn became frustrated and tired after the meth began to wear off, so he "passed out" on a recliner chair in the yard. Vaughn later woke, walked over to his truck, and went back to sleep.

After Appellant was initially unable to determine what caused his dogs to bark, Appellant testified that he saw a light or reflection outside, and that he decided to further investigate. Appellant retrieved his shotgun and went outside. He testified that he did not know the identity of the prowler at that point in time. Appellant's wife also testified that Appellant did not know the identity of the prowler, but on a recorded statement she made shortly after the incident, she

5

told Van Zandt County Sheriff's Department Sergeant Vickie Stofle that when Appellant came inside and retrieved his shotgun before the shooting, he told his wife that he thought the prowler was White. Furthermore, in her recorded statement, Appellant's wife explained that she heard White yelling after the gunshot.

After the shooting, Appellant's daughter made a statement that she was awake before the gunshot and heard White's voice say, "Woah, woah, it's me" prior to the shot. In a written statement later drafted at Appellant's attorney's office, as well as at trial, Appellant's daughter stated that she did not hear anything until the shot was fired, followed by a voice stating, "Ah, ah, you got me." Furthermore, Appellant's wife stated on the 911 call, after the shot, that she believed White was the prowler.

Appellant testified that the prowler ran towards him yelling "Fuck you," while shining a flashlight in his direction and holding what he thought to be a gun. Appellant testified that he was scared for his life and he fired the shotgun. He further explained that he did not know it was White until he fell back after being shot and the flashlight shined on his face. However, the authorities searched the area extensively for any evidence of a flashlight or other light source and found none. In contrast, in Appellant's interview after the shooting, he never mentioned that he thought White had a gun. It was only after continual questioning by investigators that Appellant mentioned being afraid he might be stabbed, even though the investigation revealed no knife or bladed object discovered at the scene. The investigators did not find any gun at the scene other than Appellant's shotgun.

The deputies that responded to the 911 call testified that Appellant showed no remorse for shooting White and made no attempt to provide first aid, medical attention, or any assistance to White as he bled to death for several minutes. Instead, the deputies testified that White was still alive when they arrived, and they attempted to provide first aid while Appellant stood emotionless in the background. However, Appellant explained that he did not know whether there were other intruders, so he decided to check on his family and subsequently discovered Vaughn's presence at his truck. The record also showed that Appellant knew Vaughn. Vaughn testified that he asked Appellant where White was, and Appellant falsely replied that he ran away.

The medical examiner testified that the shot occurred at a downward angle based on the nature of the wound and location of the bird shot in White's body. The firearms expert testified

6

that, based on the patterning of the shot, as well as the fact that the wadding of the shotgun shell was located inside White's chest cavity and abdomen, Appellant fired the shot within six to eight feet of White. The State theorized that, based on the close distance and downward angle of the shot, Appellant shot White while he was setting the tools down to signal his surrender or after he kneeled and begged for his life. Appellant offered the contrasting theory that the downward angle could be explained by a difference in height between Appellant and White, as well as the downward sloping grade of the property. The record shows that Appellant was only a couple of inches taller than White, and photos of the scene do not clearly show an extensive slope on the property where the shooting occurred.

As sole judge of the weight and credibility of the evidence, the jury was entitled to choose which version of the facts to believe and, in doing so, could resolve any inconsistencies either for or against Appellant. *See **Clayton***, 235 S.W.3d at 778; *see also **Saxton***, 804 S.W.2d at 914. Based on the testimony and evidence presented, the jury could have reasonably concluded that Appellant knew the prowler was White and that he was not justified in engaging in deadly force self-defense when he shot him. Even though the incident occurred at night in a rural area on Appellant's property, the evidence showed that Appellant knew White and others frequently traversed his property at night, Appellant's account of the event was unsupported by the evidence and investigation conducted by the authorities, the evidence suggested that he knew the prowler was White and not a threat, Appellant was the aggressor, and he made no attempt to assist White after shooting him.[2] The jury could have determined that Appellant did not engage in a struggle with White, was not responding to the use of deadly force, and was the aggressor on the morning of the shooting. Accordingly, the jury was entitled to reject Appellant's contention of self-defense and could reasonably conclude that Appellant shot White when such force was not immediately necessary to protect himself from White. *See* TEX. PENAL CODE ANN.

---

[2] The trial court also included instructions in the jury charge from which the jury could find Appellant not guilty of murder by satisfying the statutory requirements for deadly force in protection of one's own property. *See* TEX. PENAL CODE ANN. §§ 9.41, 9.42 (West 2019). Appellant claimed that a storage case in Vaughn's truck belonged to him. Accordingly, he claimed at trial in accordance with the statutes that (1) he had the reasonable belief that deadly force was immediately necessary to prevent theft or flight therefrom during the nighttime; and (2) he reasonably believed that the property could not be protected or recovered by any other means, or that the use of force other than deadly force to protect or recover the property would expose him or another to a substantial risk of death or serious bodily injury. *See id.* § 9.42. However, White's father testified that the case belonged to White, and Vaughn testified that the pair were there only to retrieve property belonging to White and his girlfriend. In any event, Appellant does not challenge on appeal the jury's implicit rejection of his theory that he was justified in using deadly force in defense of property.

§§ 9.31(a), 9.32(a). Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found against Appellant on his deadly force self-defense claim beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914.

Because the evidence is sufficient to support the jury's implicit rejection of Appellant's deadly force self-defense claim, we overrule Appellant's third issue. *See, e.g., Smith v. State*, No. 12-16-00329-CR, 2017 WL 4161594, at \*3 (Tex. App.—Tyler Sept. 20, 2017, pet. ref'd) (mem. op., not designated for publication) (holding evidence supported jury's implicit rejection of deadly force self-defense when tenant entered property of maintenance worker at mobile home park to return key and confront worker for inflammatory comments made by worker to tenant's wife, and worker killed tenant with shotgun, even though tenant was on Appellant's property in close proximity at time of shooting).

## INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant contends in his first and second issues that he received ineffective assistance of counsel during the punishment phase of his trial and that the trial court abused its discretion when it denied his motion for new trial based on his ineffective assistance of counsel claim. Because these issues are related, we address them together.

### Standard of Review

A defendant may move for a new trial based on ineffective assistance of counsel. *See Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim. App. 1993). When an appellant presents his ineffective assistance claim to the trial court in a motion for new trial, an appellate court analyzes his claim as a challenge to the denial of his motion for new trial. *See Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004) (holding appropriate standard of review for ineffective assistance claim brought forth in motion for new trial is abuse of discretion), *superseded by statute on other grounds as stated in State v. Herndon*, 215 S.W.3d 901, 905 n.5 (Tex. Crim. App. 2007); *see also Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012), *overruled on other grounds by Miller v. State*, 548 S.W.3d 497 (Tex. Crim. App. 2018).

We review a trial court's grant or denial of a motion for new trial for an abuse of discretion. *State v. Gutierrez*, 541 S.W.3d 91, 97–98 (Tex. Crim. App. 2017); *State v. Simpson*, 488 S.W.3d 318, 322 (Tex. Crim. App. 2016); *State v. Boyd*, 202 S.W.3d 393, 401 (Tex. App.—

Dallas 2006, pet. ref'd). A trial court is given wide latitude in making the decision to grant or deny a motion for new trial. *Boyd*, 202 S.W.3d at 401.

In ruling on a motion for new trial, we apply a deferential standard of review. *Najar v. State*, 618 S.W.3d 366, 371 (Tex. Crim. App. 2021). The trial court is the exclusive judge of the credibility of the evidence presented at the motion for new trial hearing. *Id.* We also defer to the trial court's credibility choices and presume that all reasonable fact findings in support of the ruling have been made. *State v. Thomas*, 428 S.W.3d 99, 104 (Tex. Crim. App. 2014).

In doing so, we "afford almost total deference to a trial court's fact findings, view the evidence in the light most favorable to the trial court's ruling, and reverse the ruling only 'if no reasonable view of the record could support' it." *Id.* (quoting *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013)). In the absence of express findings, we must presume all findings in favor of the prevailing party. *Najar*, 618 S.W.3d at 371 (citing *Okonkwo*, 398 S.W.3d at 694). We will reverse the trial judge's ruling "only if we discern an abuse of discretion, that is, if the ruling is arbitrary or unsupported by any reasonable view of the evidence." *Id.*

**Applicable Law**

In reviewing an ineffective assistance of counsel claim, we follow the United States Supreme Court's two-pronged test in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Hernandez v. State*, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986). Under the first prong of the Strickland test, an appellant must show that counsel's performance was "deficient." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. To be successful, an appellant must "show that counsel's representation fell below an objective standard of reasonableness." *Id.*, 466 U.S. at 688, 104 S. Ct. at 2064; *Tong*, 25 S.W.3d at 712.

Under the second prong, an appellant must show that the "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Tong*, 25 S.W.3d at 712. The appropriate standard for judging prejudice requires an appellant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Tong*, 25 S.W.3d at

9

712. The appellant must prove that his attorney's errors, judged by the totality of the representation and not by isolated instances of error, denied him a fair trial. **Burruss v. State**, 20 S.W.3d 179, 186 (Tex. App.—Texarkana 2000, pet. ref'd).

It is not enough for the appellant to show that the errors had some conceivable effect on the outcome of the proceedings. **Id.** He must show that there is a reasonable probability that, but for his attorney's errors, the jury would have had a reasonable doubt about his guilt or that the extent of his punishment would have been less. *See **id.**; see also* **Bone v. State**, 77 S.W.3d 828, 837 (Tex. Crim. App. 2002). A reasonable probability is a probability sufficient to undermine confidence in the outcome. **Strickland**, 466 U.S. at 694, 104 S. Ct. at 2068; **Tong**, 25 S.W.3d at 712. An appellant claiming ineffective assistance of counsel must affirmatively prove prejudice from counsel's deficient performance. **Mitchell v. State**, 989 S.W.2d 747, 748 (Tex. Crim. App. 1999). Review of trial counsel's representation is highly deferential. **Tong**, 25 S.W.3d at 712. We indulge in a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." **Strickland**, 466 U.S. at 689, 104 S. Ct. at 2065.

It is Appellant's burden to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. **Id.**; **Tong**, 25 S.W.3d at 712. Moreover, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. **Thompson v. State**, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. **Id**.

**Discussion**

Appellant argues that his counsel was ineffective during the punishment phase for several reasons. At the outset, we note that an individual adjudged guilty of a first-degree felony such as murder shall be punished by imprisonment for life or for any term of not more than ninety-nine years or less than five years. *See* TEX. PENAL CODE ANN. § 12.32 (West 2019). The State requested a sentence of forty years of imprisonment, and the jury assessed a thirty-five year sentence, which is below the middle of the range. Appellant rejected a ten-year plea bargain offer negotiated by counsel.

Appellant's appellate counsel presented the ineffective assistance claim as part of his motion for new trial. Unlike many cases, the trial court held an extensive hearing on the motion for new trial where appellate counsel presented many witnesses and other evidence to support his

claim, including the testimony of trial counsel to explain his trial strategy for various decisions he made during his representation of Appellant.

Appellant first generally contends that counsel failed to perform an adequate mitigation investigation. Failure to conduct an adequate investigation may constitute ineffective assistance of counsel. *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 521-23, 123 S. Ct. 2527, 2535-36, 156 L. Ed. 2d 471 (2003). As the Supreme Court said in *Strickland*, "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S. Ct. at 2066. A claim for ineffective assistance based on trial counsel's failure to investigate generally fails absent a showing of what the investigation would have revealed that reasonably could have changed the result of the case. *Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (citing *Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007)).

Appellant contends that trial counsel failed to conduct such an investigation, and relies on *Andrus* and *Porter*, but those capital punishment cases are distinguishable because counsel failed to conduct *any* investigation or uncover any relevant information that might mitigate his punishment. *See Andrus v. Tex.*, 140 S. Ct. 1875, 1881-82, 207 L. Ed. 2d 335 (2020) (per curiam) (holding counsel provided constitutionally deficient performance at penalty phase of defendant's capital murder trial, where counsel performed almost no mitigation investigation and overlooked vast tranches of mitigating evidence, including evidence defendant had attempted suicide in prison, as well evidence of extreme neglect and privation during his childhood, and counsel did not prepare the witnesses he presented); *Porter v. McCollum*, 558 U.S. 30, 39-40, 130 S. Ct. 447, 453, 175 L. Ed. 2d 398 (2009) (holding trial counsel had duty to conduct some sort of mitigation investigation, which he wholly failed to conduct, and failed to uncover and present any evidence of defendant's mental health or mental impairment, his family background, or his military service, which did not reflect reasonable professional judgment).

Here, the record does not support Appellant's contention that counsel conducted no mitigation investigation. Rather, the record shows that Appellant retained trial counsel, who counsel had represented Appellant or his family on other legal matters and had extensive familiarity with Appellant, his background, and various physical and mental conditions and ailments. In other words, as we discuss below, the record shows that trial counsel performed an adequate investigation, but that he had specific strategic reasons not to present the specific

witnesses or evidence that Appellant claims should have been presented. In fact, the record shows that counsel conducted significant investigation. He met with Appellant and his family several times, interviewed several witnesses, hired a consultant and two investigators to perform various tasks, traveled to the scene taking photos and surveyed the premises, and engaged in extensive preparation of the case.

As part of his ineffective assistance claim, Appellant contends that counsel failed to call several witnesses, including Appellant's neighbor, Appellant's primary care physician, and his counselor. Appellant's neighbor testified at the motion for new trial hearing concerning Appellant's good character and bad character of the victim, such as allegations that White and his girlfriend had violent fights and there were several thefts in the area after White moved to Appellant's property. Counsel testified that he consulted the neighbor during his investigation but decided not to call him. Furthermore, the neighbor, during the State's cross-examination at the new trial hearing, admitted he was unaware that Appellant had been arrested for theft during the pendency of trial while out on bond, implicating counsel's trial strategy for not calling him. As for Appellant's primary care physician and counselor, counsel testified at the hearing that he did not believe any information they could provide would be pertinent to his strategy. They testified to Appellant's physical and mental ailments.[3] Appellate counsel also attempted to use these witnesses at the new trial hearing to cast doubt on Appellant's competency. However, these witnesses admitted that he was competent. The record also showed that trial counsel hired a consultant who informally evaluated Appellant and concluded that he was competent. Furthermore, subsequent testing showed that Appellant did not suffer from intellectual developmental disorder, and there was no other evidence to suggest that he was incompetent or that his conditions affected his decision to shoot White. In fact, the jury heard evidence that Appellant did not suffer from these ailments at the time he shot White and that he was in good physical condition on the night in question.

In a related sub-issue, Appellant also argues that trial counsel was ineffective in failing to offer medical records of his various physical and mental ailments. However, the jury heard evidence during the guilt-innocence phase of trial concerning these issues, such as Appellant's

---

[3] They testified that Appellant's medical records showed that he suffered at some point from an ear cyst, testicular swelling and pain, memory loss, chest pain, a severe episode of recurrent major depressive disorder without psychotic features, compression neuropathy of his right lower extremity, lumbar myelopathy, upper respiratory infection, right foot pain, chronic fatigue, acute upper back pain, bilateral hand swelling, neck pain, and a blood clot in his lung.

lung blood clot, back problems, swollen testicle, use of a walker, depression, anxiety, and various other ailments. "By operation of law, the evidence admitted during the guilt-innocence phase of the trial is also before the jury at the penalty phase, and the jury may consider all the evidence adduced at the guilt-innocence phase in assessing a defendant's punishment." *Atkinson v. State*, 404 S.W.3d 567, 572 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (citing *Wright v. State*, 212 S.W.3d 768, 776 (Tex. App.—Austin 2006, pet. ref'd)); *see Green v. State*, 839 S.W.2d 935, 945–46 (Tex. App.—Waco 1992, pet. ref'd) ("Evidence presented during the guilt stage is automatically before the jury on punishment regardless of whether it is formally re-offered by the State."). Thus, there is no requirement that evidence admitted during the guilt-innocence phase be reoffered to be considered for punishment. *See Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003). Moreover, the appropriate examination of the record in an ineffective assistance of counsel claim includes counsel's representation during pretrial, the guilt-innocence stage of the trial, and the punishment stage. *See Rodd v. State*, 886 S.W.2d 381, 384 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). Furthermore, the jury observed physical manifestations of some of these conditions at the trial itself. Finally, counsel actually offered the testimony of Appellant's wife during punishment, including how a lengthy sentence would affect her income and ability to provide for their children. Counsel testified at the hearing that offering these medical records with complicated medical jargon would not have been relevant or helpful. To the extent that Appellant contends counsel's investigation was insufficient and that he failed to offer these documents, we note that counsel was aware of his condition and used some of this information concerning Appellant's condition to support his motion for continuance. So, trial counsel was aware of this evidence, but implemented a trial strategy that it would not be relevant or helpful to the jury.

Appellant also contends that trial counsel's general brevity of evidence during the punishment phase fell below objective standards of professional competence and that he inflamed the jury by telling them not to make the same mistake as they made in finding him guilty of the offense. However, trial counsel explained that the jury already found him guilty of the offense, so an attempt to make the jury like him during punishment and subsequently assess a reduced sentence would seem disingenuous and not be fruitful. Instead, he implemented the more aggressive strategy to highlight his belief that the jury incorrectly found him guilty, so that it had an opportunity to mitigate its own mistake and assess a minimal sentence. Counsel, an

experienced criminal defense attorney, testified that he successfully implemented this strategy in the past to obtain a lower sentence. Furthermore, after the lengthy guilt-innocence phase of trial, counsel elected to make his argument short and sharp. As the State points out, it responded in kind and presented minimal evidence during the punishment phase. But the State explained that, had trial counsel put on such extensive evidence, it would have highlighted the evidence to emphasize the facts of the case, including that Appellant did not aid White in any way after shooting him or show remorse or emotion for what he had done, and highlighting the inconsistencies in Appellant's version of the event.

Next, Appellant contends counsel failed to present several photos of Appellant, his family in various settings such as holiday photos, and photos of his prior wife and son who were killed in a car wreck nearly two decades prior to this incident. Counsel testified that he has a general practice not to present such photos to the jury. He explained that he did not like to use many of these particular photos, because some of them showed Appellant in a beard in a somewhat disheveled state. He elaborated that, in his experience, jurors do not trust men with facial hair. Moreover, witnesses at the hearing admitted that presenting such photos could result in the State offering photos of the victim and his family, coupled with arguments to the effect that because Appellant killed the victim, White would be unable to be present at holiday celebrations, partake in future family photos, and the like.

Finally, Appellant contends that trial counsel was ineffective because he allegedly fell asleep during a portion of the trial. Appellant, his wife, and one of his daughters testified at the new trial hearing that they believed counsel slept while the jury viewed the video of Appellant's interview with the investigating officers. Counsel vehemently denied that he fell asleep at any point during the trial but admitted that he might have closed his eyes for several minutes at a time. First, we note that this argument pertains to conduct that allegedly occurred within the guilt-innocence phase of the trial, which is outside the scope of the issue Appellant raised on appeal—that counsel was ineffective during the punishment phase. Second, Appellant relies on the courtroom video, but does not point to a specific portion in which it appears that counsel fell asleep. Moreover, our review of the video does not support Appellant's contention. The trial court was free to disbelieve the allegation by Appellant, his wife, and his daughter that counsel fell asleep during the trial. *See **Najar***, 618 S.W.3d at 371; ***Thomas***, 428 S.W.3d at 104.

In summary, the allegations to support Appellant's ineffective assistance claim are either unsupported by the record, the result of sound trial strategy, or he failed to overcome the presumption of reasonableness or show how he was harmed thereby. Therefore, Appellant failed to discharge his burden to show that there is a reasonable probability that, but for his attorney's errors, the jury would have had a reasonable doubt about his guilt or that the extent of his punishment would have been less. *See **Bone***, 77 S.W.3d at 837; *see also **Burruss***, 20 S.W.3d at 186. Accordingly, Appellant failed to establish that the trial court abused its discretion when it denied his motion for new trial based on the alleged ineffective assistance of counsel claim. *See **Riley***, 378 S.W.3d at 457; *see also **Charles***, 146 S.W.3d at 208.

Appellant's first and second issues are overruled.

## DISPOSITION

Having overruled Appellant's three issues, the judgment of the trial court is ***affirmed***.

GREG NEELEY
Justice

Opinion delivered February 9, 2022.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**FEBRUARY 9, 2022**

**NO. 12-20-00114-CR**

**DWIGHT DEAN ROSAMOND,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the County Court at Law

of Van Zandt County, Texas (Tr.Ct.No. CR18-00334)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*